## UNITED STATES ET AL. *v.* COUNTY OF ALLEGHENY.

No. 417. Argued March 1, 1944.—Decided May 1, 1944.

*Solicitor General Fahy,* with whom *Assistant Attorney General Samuel O. Clark, Jr., Judge Advocate General Cramer,* and *Messrs. Sewall Key, J. Louis Monarch, Alvin J. Rockwell,* and *Paul F. Mickey* were on the brief, for the United States; and *Messrs. Elder W. Marshall* and *Carl E. Glock* submitted for the Mesta Machine Co.,—appellants.

*Mr. Edward G. Bothwell,* with whom *Mr. John J. O'Connell* was on the brief, for appellee.

By special leave of Court, *Miss Anne X. Alpern,* with whom *Messrs. Ray L. Chesebro, L. E. Latourette, William E. Kemp, Richmond B. Keech, J. H. O'Connor,* and *Charles S. Rhyne* were on the brief, for the member cities of the National Institute of Municipal Law Officers, as *amici curiae,* urging affirmance.

MR. JUSTICE JACKSON delivered the opinion of the Court.

We are called upon to solve another of the recurring conflicts between the power to tax and the right to be free from taxation which are inevitable where two governments function at the same time and in the same territory.

176

In arguing the case of *McCulloch* v. *Maryland,* Luther Martin, Attorney General of Maryland, himself a member of the Constitutional Convention, said, "The whole of this subject of taxation is full of difficulties, which the Convention found it impossible to solve, in a manner entirely satisfactory. The first attempt was to divide the subjects of taxation between the State and the national government. This being found impracticable, or inconvenient, the State governments surrendered altogether their right to tax imports and exports, and tonnage; giving the authority to tax all other subjects to Congress, but reserving to the States a concurrent right to tax the same subjects to an unlimited extent. This was one of the anomalies of the government, the evils of which must be endured, or mitigated by discretion and mutual forbearance." *McCulloch* v. *Maryland,* 4 Wheat. 316, 376. Where discretion and forbearance have failed, it often has fallen to this Court to determine specific cases for which the Convention was unable to agree upon a general rule. Looking backward it is easy to see that the line between the taxable and the immune has been drawn by an unsteady hand.

But since 1819, when Chief Justice Marshall in the *McCulloch* case expounded the principle that properties, functions, and instrumentalities of the Federated Government are immune from taxation by its constituent parts, this Court never has departed from that basic doctrine or wavered in its application. In the course of time it held that even without explicit congressional action immunities had become communicated to the income or property or transactions of others because they in some manner dealt with or acted for the Government.[1] In

[1] See *Dobbins* v. *Commissioners,* 16 Pet. 435; *Collector* v. *Day,* 11 Wall. 113; *New York ex rel. Rogers* v. *Graves,* 299 U. S. 401; *Osborn* v. *Bank of United States,* 9 Wheat. 738; *Owensboro National*

recent years this Court has curtailed sharply the doctrine of implied delegated immunity.[2]  But unshaken, rarely questioned, and indeed not questioned in this case, is the principle that possessions, institutions, and activities of the Federal Government itself in the absence of express congressional consent are not subject to any form of state taxation.  The real controversy here is whether, especially in view of recent decisions, taxing authorities of the Commonwealth of Pennsylvania have infringed this admitted immunity.

Mesta Machine Company, an appellant with the United States, exists as a corporation under the laws of Pennsylvania and has a manufacturing plant in the County of Allegheny, of that Commonwealth, the County being appellee herein.  It is engaged in the manufacture of heavy machinery.  In October 1940, the War Department desired to produce a quantity of large field guns.  It could have assembled an organization, created a Government-owned corporation, and erected a plant which would have been wholly tax immune.  *Clallam County* v. *United States,* 263 U. S. 341.  But for reasons of time and policy it chose to utilize a going concern under private management and ownership.  Mesta's plant was not equipped for the manufacture of ordnance.  It was agreed that certain additional equipment specially required for

*Bank* v. *Owensboro,* 173 U. S. 664; *Choctaw, O. & G. R. Co.* v. *Harrison,* 235 U. S. 292; *Gillespie* v. *Oklahoma,* 257 U. S. 501; *Jaybird Mining Co.* v. *Weir,* 271 U. S. 609; *Federal Land Bank* v. *Crosland,* 261 U. S. 374; *Telegraph Co.* v. *Texas,* 105 U. S. 460; *Leloup* v. *Port of Mobile,* 127 U. S. 640; *Indian Motocycle Co.* v. *United States,* 283 U. S. 570; *Panhandle Oil Co.* v. *Mississippi ex rel. Knox,* 277 U. S. 218; *Graves* v. *Texas Co.,* 298 U. S. 393.

[2] See *Alabama* v. *King & Boozer,* 314 U. S. 1; *Graves* v. *New York ex rel. O'Keefe,* 306 U. S. 466; *James* v. *Dravo Contracting Co.,* 302 U. S. 134; *Helvering* v. *Gerhardt,* 304 U. S. 405; *Helvering* v. *Mountain Producers Corp.,* 303 U. S. 376.

the work should be furnished at Government cost and should remain the property of the United States.

The basic arrangement between Mesta and the Government was provided for by three separate titles of a single contract, made in October 1940. A title was devoted to each feature of the arrangement, being generally: procurement of Government-owned equipment at Government cost; lease of such equipment by the Government to Mesta; and Mesta's undertaking to make and deliver the guns at a fixed price each. In February 1941 a supplemental contract was made.

Under the first title of the contract, machinery was to be procured in three possible ways: Mesta, as an independent contractor and not as agent of the Government, could purchase it; Mesta could manufacture it; or the Government at its option could furnish any part of it. In carrying out the agreement Mesta manufactured one machine, the Government furnished eight gun-boring lathes and two rifling machines from its Watervliet Arsenal, and the rest Mesta purchased from other machine-tool manufacturers. The machinery bought or built by Mesta was inspected and accepted on behalf of the United States, which thereupon compensated Mesta as agreed. The contract provided that title to all such property should vest in the Government upon delivery at the site of work and inspection and acceptance.

By the second title of the contract the Government leased this equipment to Mesta for the period during which guns are manufactured by it under this contract or later supplements. As rental Mesta agreed to pay the sum of one dollar. Mesta was permitted to use the equipment "for the purpose of expediting the manufacture of guns" and for no other, without consent, except that such machinery as was "purchased or furnished to supplement its existing facilities" might be used "for general purposes." Liability of Mesta for loss, damage, or destruction

of equipment was "that of a bailee under a mutual benefit bailment." Mesta could not remove any of it without permission, and at all times it was accessible to Government inspection. On termination of the gun-supply contract, unless a stand-by contract was made, Mesta agreed to remove and ship the equipment according to Government directions, in good condition subject to fair wear and tear and depreciation.

The leasing title of the contract made no mention of taxation. The equipment-procurement title provided for reimbursement of Mesta "in the performance of the work under this Title" for payments "under the Social Security Act, and any applicable State or local taxes, fees, or charges which the Contractor may be required on account of this contract to pay on or for any plant, equipment, process, organization, materials, supplies, or personnel." The gun-supply title recited that the contract price did not "include any tax imposed by any state, county, or municipality upon the transaction of this purchase of guns. The Government shall not be liable, directly or indirectly, for the payment of any such taxes, except that if the Contractor after using every effort short of litigation to procure exemption or refund, as the case may be, should be compelled to pay to any state, county or municipality, any tax upon the transaction of this procurement, an amount equal to the tax so paid shall be paid by the Government on demand of the Contractor, in addition to the prices herein stated." The Government admits liability to reimburse Mesta if it is obliged to pay tax by reason of the assessment in question here.

The machinery was bolted on concrete foundations in Mesta's plant on real property owned by it. It could be removed without damage to the building.

The present controversy flared when the assessing authorities of Allegheny County revised Mesta's previously determined assessment for ad valorem taxes. They added

thereto the value of the machinery in question, fixed at $618,000. This included property acquired from other tool manufacturers as above described, $444,000; that manufactured by Mesta, $14,000; lathes brought from the Watervliet Arsenal, $160,000. Mesta protested and exhausted administrative remedies without avail, and on July 30, 1942, paid under protest $5,137.12, the amount of the tax attributable to this increased assessment.

Mesta took a timely appeal allowed by statute to the Court of Common Pleas. The United States petitioned to intervene, reciting that it would be required to reimburse Mesta by force of its contract. Intervention was permitted against objection by the County, and the United States has participated in the litigation since. Mesta attacked the assessment under both state and federal law, claiming that under the State Tax Law property belonging to another was not to be considered a part of its mill and that if construed to authorize assessment and taxation of this machinery, the statute violated the Federal Constitution.

The Court of Common Pleas held that the State Act authorized the assessment, but that the machinery here involved was "owned by the United States" and so for constitutional reasons could not be included.

The Supreme Court of Pennsylvania, on appeal of the County, reversed, and reinstated the assessment. It held that under the state law regardless of who held the title to it the machinery constituted a part of the mill for purposes of assessment and was properly assessed as real estate. It acknowledged that property held by the United States is "beyond the pale of taxation" by a state, but this assessment, it said, is not against the United States but against Mesta, which is operating its mill for private purposes. If Mesta defaulted in tax payments, the Court held that "the paramount rights of the Government in the

machinery could not be divested or in any way affected," hence the Government could suffer no loss. Evidence that the machinery was not owned by Mesta it held to be irrelevant and improperly admitted. Two Justices dissented.

The United States and Mesta appealed and we postponed consideration of jurisdictional questions to the hearing on the merits.

## I.

It is denied that the Government has valid title to the machinery. This contention is urged by the member cities of the National Institute of Municipal Law Officers, permitted to file a brief and to argue orally as *amici curiae*. Their position is that "the Government is subject to the legal rules applicable to private transactions." Under Pennsylvania law transfer of title to personal property to be good as against subsequent purchasers and lienors must be accompanied by delivery of possession. They say that inspection and acceptance by a contracting officer on behalf of the United States at the Mesta plant did not under decisional law of Pennsylvania amount to delivery of possession to the United States and hence that its title is defective. The position of the County is less extreme. It argued earlier in the litigation that the machinery became part of Mesta's real estate upon installation and that the United States had only "a reversionary interest after the termination of the contract." It later conceded that title to the property was not in Mesta "except for tax purposes." The Pennsylvania Supreme Court thought it immaterial whether title was in the Government, but said, ". . . this private arrangement between the Mesta Company, the owner of the land and buildings and operator of the mill, and the federal government, the owner of the machinery, which treats the equipment as personal property and per-

mits the latter to remove it at the termination of the contract, can in no way change the legal effect of the Act of Assembly which specifically designates machinery, under these circumstances, as real estate for tax purposes."

We do not determine whether, under Pennsylvania law, the retention of possession by Mesta would protect only good-faith purchasers or lienors who relied upon it or whether, as urged by the *amici*, it also makes the Government's title imperfect as against these taxing authorities, who were fully advised of the Government's claim before the assessment was made. Even if the latter were true, we do not think the state law would be decisive of the question of title.

The Constitution provides that "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States . . ." Art. IV, § 3, cl. 2. It also gives Congress the power "To make all Laws which shall be necessary and proper for carrying into Execution" all powers vested in the Government or in any department or officer thereof, Art. 1, § 8, cl. 18, and it makes the laws of the United States enacted pursuant thereto "the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." Art. VI, cl. 2.

Every acquisition, holding, or disposition of property by the Federal Government depends upon proper exercise of a constitutional grant of power. In this case no contention is made that the contract with Mesta is not fully authorized by the congressional power to raise and support armies and by adequate congressional authorization to the contracting officers of the War Department. It must be accepted as an act of the Federal Government warranted by the Constitution and regular under statute.

Procurement policies so settled under federal authority may not be defeated or limited by state law. The purpose of the supremacy clause was to avoid the introduction of disparities, confusions and conflicts which would follow if the Government's general authority were subject to local controls. The validity and construction of contracts through which the United States is exercising its constitutional functions, their consequences on the rights and obligations of the parties, the titles or liens which they create or permit, all present questions of federal law not controlled by the law of any State. *Clearfield Trust Co.* v. *United States,* 318 U. S. 363; *Jackson County* v. *United States,* 308 U. S. 343; *Carpenter* v. *Shaw,* 280 U. S. 363; *Utah Power & Light Co.* v. *United States,* 243 U. S. 389; *United States* v. *Ansonia Brass & Copper Co.,* 218 U. S. 452; see *D'Oench, Duhme & Co.* v. *Federal Deposit Ins. Corp.,* 315 U. S. 447; *Deitrick* v. *Greaney,* 309 U. S. 190; *Federal Land Bank* v. *Bismarck Lumber Co.,* 314 U. S. 95. Federal statutes may declare liens in favor of the Government and establish their priority over subsequent purchasers or lienors irrespective of state recording acts. *Detroit Bank* v. *United States,* 317 U. S. 329; *United States* v. *Snyder,* 149 U. S. 210. Or the Government may avail itself, as any other lienor, of state recording facilities, in which case, while it has never been denied that it must pay nondiscriminatory fees for their use, the recording may not be made the occasion for taxing the Government's property. *Federal Land Bank* v. *Crosland,* 261 U. S. 374; *Pittman* v. *Home Owners' Loan Corp.,* 308 U. S. 21.

We hold that title to the property in question is in the United States and is effective for tax purposes.

## II.

The County denies, however, that it is taxing property belonging to the United States. First, it says it taxes only the land, which the United States does not own; and the

machinery is not taxed, but is considered only as an enhancement of the value of the land to Mesta, its owner. Secondly, it says the lien of the tax does not encumber and the process of collection does not involve any sale or other interference with the machinery. The Pennsylvania Supreme Court has upheld the questioned tax because upon these grounds it concluded that no interference with the federal function resulted.

"Where a federal right is concerned we are not bound by the characterization given to a state tax by state courts or legislatures, or relieved by it from the duty of considering the real nature of the tax and its effect upon the federal right asserted." *Carpenter* v. *Shaw*, 280 U. S. 363, 367–68.

It is not contended that the scheme of taxation employed by Pennsylvania is anything other than the old and widely used ad valorem general property tax. This taxation plan involves the identification and valuation of the variable individual holdings to be taxed, commonly called the assessment, the application of a uniform rate calculated on the need for public revenues, and the collection, in default of payment, by distraint and sale of the property assessed and taxed. This form of taxation is not regarded primarily as a form of personal taxation but rather as a tax against the property as a thing. Its procedures are more nearly analogous to procedures *in rem* than to those *in personam*. While personal liability for the tax may be and sometimes is imposed, the power to tax is predicated upon jurisdiction of the property, not upon jurisdiction of the person of the owner, which often is lacking without impairment of the power to tax. In both theory and practice the property is the subject of the tax and stands as security for its payment.

The Pennsylvania statutes embody this scheme of taxation. They are a century old. The basic provision reads:

"The following *subjects and property* shall . . . be valued and assessed, and *subject to taxation*." [3] Taxes are "declared to be a *first lien on said property*." [4] (Emphasis supplied.) It is only under these legislative provisions that the tax in question is laid.

The procedure of the assessors is consistent with no other theory than that the machinery itself was being assessed and taxed exactly as land was being assessed and taxed. The Government-owned machinery was inspected and itemized by the assessor, each machine was then separately appraised by a machinery expert, and the aggregate full values of $618,000 were carried into the assessment. The assessment against Mesta was entered in the books of the assessors as follows: "Land, $293,795; Buildings, $1,123,124; Machinery, $2,489,085; Total assessment, $3,906,004." The machinery item included the value of the Government's property.

The assessors made no claim that the temporary presence of the Government's machinery actually enhanced the market value or the use value of Mesta's land. The assessors simply and forthrightly valued Mesta's land as land, and the Government's machines as machinery, and added the latter to the former. We discern little theoretical difference, and no practical difference at all, between what was done and what would be done if the machinery were taxed in form. Its full value was ascertained and added to the base to which the annual rates would apply for county, city, borough, town, township, school, and poor purposes.

We hold that the substance of this procedure is to lay an ad valorem general property tax on property owned by the United States.

---

[3] Penn. Stat. Ann. (Purdon) tit. 72, § 5020–201.

[4] *Id.*, tit. 53, § 2022.

## III.

It is contended, however, that Government title does not prevent such state taxation, because the incidence of the tax is borne by Mesta, not the Government, and the taxation creates no lien upon its property or interference with its function.

The Commonwealth certainly has broad powers and choices of methods to tax Mesta, a corporation created by it and domiciled and operating within its borders. The trend of recent decisions has been to withdraw private property and profits from the shelter of governmental immunity but without impairing the immunity of the State or the Nation itself. Benefits which a contractor receives from dealings with the Government are subject to state income taxation.[5] Salaries received from it may be taxed.[6] The fact that materials are destined to be furnished to the Government does not exempt them from sales taxes imposed on the contractor's vendor.[7] But in all of these cases what we have denied is immunity for the contractor's own property, profits, or purchases. We have not held either that the Government could be taxed or its contractors taxed because property of the Government was in their hands. The distinction between taxation of private interests and taxation of governmental interests, although sometimes difficult to define, is fundamental in application of the immunity doctrine as developed in this country.

Mesta has some legal and beneficial interest in this property. It is a bailee for mutual benefit. Whether such a right of possession and use in view of all the circumstances could be taxed by appropriate proceedings we do not decide. Its leasehold interest is subject to some

---

[5] *James* v. *Dravo Contracting Co.,* 302 U. S. 134.

[6] *Graves* v. *New York ex rel. O'Keefe,* 306 U. S. 466.

[7] *Alabama* v. *King & Boozer,* 314 U. S. 1.

qualification of the right to use the property except for gun manufacture, is limited to the period it engages in such work, and is perhaps burdened by other contractual conditions. We have held that where private interests in property were so preponderant that all the Government held was a naked title and a nominal interest, the whole value was taxable to the equitable owner. *Northern Pacific Ry. Co.* v. *Myers,* 172 U. S. 589; *New Brunswick* v. *United States,* 276 U. S. 547. But that is not the situation here, and the State has made no effort to segregate Mesta's interest and tax it. The full value of the property, including the whole ownership interest, as well as whatever value proper appraisal might attribute to the leasehold, was included in Mesta's assessment.

It is contended the whole value of the property may be reached since the impact of the tax is upon Mesta. In support of this we are reminded that the tax, so the Supreme Court of Pennsylvania held, falls upon the real estate alone, because the lien thereof does not touch the Government's property, which before or after tax default may be removed. But renunciation of any lien on Government property itself, which could not be sustained in any event, hardly establishes that it is not being taxed. The fact is that the lien on the underlying land is increased because of and in proportion to the assessment of the machinery. If the tax is collected by selling the land out from under the machinery, the effect on its usefulness to the Government would be almost as disastrous as to sell the machinery itself. The coercion of payment from compelling the Government to move its property and interrupt production at the Mesta plant would defeat the purpose of the Government in owning and leasing it.

We think, however, that the Government's property interests are not taxable either to it or to its bailee. The "Government" is an abstraction, and its possession of property largely constructive. Actual possession and cus-

tody of Government property nearly always are in someone who is not himself the Government but acts in its behalf and for its purposes. He may be an officer, an agent, or a contractor. His personal advantages from the relationship by way of salary, profit, or beneficial personal use of the property may be taxed as we have held. But neither he nor the Government can be taxed for the Government's property interest. Rarely does a state or municipality pursue the Federal Government itself. Most of the immunity cases we have been called upon to deal with involved assertion of a right to tax Government property against an individual. In *United States* v. *Rickert,* 188 U. S. 432, this Court decided that improvements made upon lands to which the United States held title but which were put in possession of Indians for their benefit remained immune from taxation and that cattle, horses, and chattels purchased with the money of the Government and "put into the hands of the Indians to be used in execution of the purpose of the Government in reference to them" were likewise immune from taxation. In *Van Brocklin* v. *Tennessee,* 117 U. S. 151, Tennessee attempted to sell for state taxes lands which the United States owned at the time the taxes were assessed and levied, but in which it had ceased to have any interest at the time of sale. There, as here, it was claimed the collection affected only private persons, whose equities in the matter were at least doubtful, and that the United States could suffer no harm. The Court held, however, that the immunity protected the private owner, for the tax had been laid against an interest of the Government which was beyond the reach of state taxing power. See also *Irwin* v. *Wright,* 258 U. S. 219; *Lee* v. *Osceola Improvement District,* 268 U. S. 643.

A State may tax personal property and might well tax it to one in whose possession it was found, but it could hardly tax one of its citizens because of moneys of the

United States which were in his possession as Collector
of Internal Revenue, Postmaster, Clerk of the United
States Court, or other federal officer, agent, or contractor.
We hold that Government-owned property, to the full
extent of the Government's interest therein, is immune
from taxation, either as against the Government itself or
as against one who holds it as a bailee.

## IV.

We find no support for the claim that the immunity
has been waived. Congress certainly has not done so. It
is true that the contract requires Mesta to obey and abide
by the "applicable" law of Pennsylvania. But such lan-
guage does not require Mesta to submit to unconstitu-
tional exactions. It clearly is inadequate to waive federal
immunity, even if we assume a contracting officer had
power to do so. Likewise any contractual obligation of
the War Department to pay Mesta's taxes does not oper-
ate either to waive or to create an immunity. Nor is the
validity of the tax dependent upon the ultimate resting
place of the economic burden of the tax. We also think
it immaterial what, if any, right of reimbursement the
Pennsylvania law grants a lessee against a private lessor
in similar circumstances. State law could not obligate
the Central Government to reimburse for a valid tax,
much less for an invalid one.

Each party urges equities in its favor. The Govern-
ment points to the exigencies of war, points to numerous
and increasing state efforts to tax such property, and
urges against the decision below that it is a precedent
for taxation of a substantial portion of property of the
Government valued at $7\frac{1}{2}$ billion dollars in the possession
and use of private contractors engaged in war production.
It owns property on private lands, under contracts simi-
lar to this, with a value approximating two billion dollars,
over $257,000,000 of it located in Pennsylvania.

190

Appellees, and especially the *amici*, on the other hand, point for a different purpose to the amount of Government property in war production. It is said that increased municipal services, to serve and protect the influx of war workers, are required in all communities where large war contracts of this type are placed; that such local services rely heavily on real estate taxation; that to exclude property such as this, together with the large real estate holdings that have been and are being acquired by the Government, imposes this increased cost on others. While validation of assessments of this character will measurably increase the cost of waging the war, it is argued that the Federal Government may diffuse the cost throughout the country instead of putting a back-breaking burden on local governments where war plants are located. For these reasons we are urged to hold the position of the Government "unsound, as well as inequitable."

Such considerations remind us of our heavy responsibility in deciding the issues but hardly provide a guide or alter the usual principles for decision. The equities in this unfortunate conflict between the United States and one of its most important industrial communities are not capable of judicial ascertainment or equalization. Whether a county loses more than it gains by such federal activity and what other federal benefits ought to be considered if a balance were to be struck between advantages and disadvantages, we cannot say. The adjustment of benefits and burdens is for other departments, and studies to that end have been undertaken.[8] We can only say that our

---

[8] See Report on Federal Contributions to States and Local Governmental Units with Respect to Federally Owned Real Estate, House Doc. No. 216, 78th Cong., 1st Sess. (1943). This comprehensive report shows the impossibility of generalizing about the equities between the Federal Government and a community in cases dealing with isolated properties. Much federally owned property is held for the accommodation and service of the locality, such as the Post Office or

constitutional system as judicially interpreted from the beginning leaves no room for the localities to impose either compensatory or retaliatory taxation on Government property interests. Their remedy lies in petition to the Federal Congress, which also is their Congress.

## V.

Our jurisdiction was questioned by appellee's motion to dismiss, and its consideration was postponed to hearing of the merits. The argument runs that the tax is laid only upon Mesta and therefore only Mesta can question its validity; that if Mesta does so, it can be only under the Fourteenth Amendment; that no question has been assigned under this Amendment and hence the appeal should be dismissed.

The questions in this case do not arise under the Fourteenth Amendment. They depend on provisions adopted and principles settled long before the Fourteenth Amendment and which exist independently of it.

The United States was admitted to the case as an intervenor. Both it and Mesta raised these questions of taxability, as either may do. The United States may question the taxation in order to protect its sovereignty over the property in question. Mesta as bailee is under a duty to protect the property and may protect itself from unlawful burdens put upon it because of its possession of the

---

the courthouses. Other is held for general administrative purposes in which the locality has an interest or for the care of wards, such as veterans, in which local inhabitants share with others. The report considers all federally owned real estate and improvements, but not personalty. It shows that the United States had within Pennsylvania on June 30, 1937, property costing $278,519,000, with market value of $151,806,000. The estimated annual tax based on fair market value at local rates would be $3,152,000. But the average annual federal aid to that State is reported to be: 1928–30, $6,834,000; 1931–33, $10,791,000; 1934–37, all kinds, $190,071,000 (excluding FERA, CWA, and WPA: $23,118,000).

property. The tax is calculated and imposed on the land and machinery as a unit, the lien of the assessment on the machinery becomes a lien on the land which can be taken to pay the tax occasioned by the machinery. Since the tax must be paid out of Mesta's property it is in a position to challenge the validity of the tax, as was the case in *Van Brocklin v. Tennessee, supra*. Both Mesta and the Government made timely insistence that the Pennsylvania Tax Law as applied violates the Federal Constitution. The highest court of the State rendered final judgment against the claim of federal right. We have jurisdiction by appeal. Judicial Code § 237 (a). The motion to dismiss is denied.

The Tax Law of the Commonwealth of Pennsylvania as interpreted and applied in this case violates the Federal Constitution in so far as it purports to authorize taxation of the property interests of the United States in the machinery in Mesta's plant, or to use that interest to tax or to enhance the tax upon the Government's bailee. The judgment is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

*Reversed.*

MR. JUSTICE BLACK and MR. JUSTICE DOUGLAS concur in the result.

MR. JUSTICE ROBERTS:

I think the judgment of the Supreme Court of Pennsylvania is right and should be affirmed for the reasons stated in its opinion.

If *James v. Dravo Contracting Co.*, 302 U. S. 134, were not upon our books, or had been decided the other way, I should agree to the opinion of the court. In that case, at the insistence of the United States, this court held that a state gross receipts tax upon payments by the United States to a contractor for erecting structures on United

States property was valid because the tax was not laid upon the contract, the Government, its property, its officers, or its instrumentality; was laid upon an independent contractor and was nondiscriminatory. Although admitting that the payment of the tax imposed a burden upon the activities of the United States because it inevitably increased the cost of exercise of its functions, the court nonetheless sustained the exaction. I then thought, as I still think, that the decision overruled a century of precedents in this court.

It was not long before the Government repented its generosity. Four years later, it insisted, in *Alabama* v. *King & Boozer*, 314 U. S. 1, that a state sales tax upon a purchase of building materials by a contractor who was to incorporate them into a Government project, and where, upon delivery, inspection, and acceptance, they became the property of the Government, was so direct a tax on the Government as to infringe its constitutional immunity. The court, however, followed to its logical conclusion the decision in *Dravo* and expressly overruled earlier decisions inconsistent with *Dravo* and *King & Boozer*.[1] I concurred in that decision, feeling myself bound by the *Dravo* case.

In this case, as I think, the court necessarily reverts to the test of burdensomeness by a form of words and, as a result, again plunges the applicable principle into confusion.

The truth is that the tax liability of Mesta in respect of its manufacturing plant has been increased by the presence in the plant of machinery bailed to the taxpayer by the federal Government. It is true too that, either as a result of the express terms of the Government's contract with Mesta, the Government's monetary obligation to

---

[1] *Panhandle Oil Co.* v. *Knox*, 277 U. S. 218; *Graves* v. *Texas Co.*, 298 U. S. 393.

194

Mesta will be increased by the imposition of increased tax or, as in the *Dravo* case, if the contractor is liable for an increase of tax by reason of the fact that he is such contractor, the Government, in the long run, will have to pay more for goods and services as a result of such increase.

In order to relieve the Government of this burden, the court is now obliged to say that the law of Pennsylvania is something different from what the Supreme Court of the Commonwealth has declared it, and that a century of State administrative and judicial construction is meaningless when the supposed necessity arises to unburden the Government from the result of state taxation upon privately owned property.

The law of Pennsylvania is, and always has been, that a tax imposed on real estate is enhanced in amount by buildings and machinery placed upon the land with the consent of the owner even though he does not own the improvements but is a mere bailee. The lien of the tax extends only to the land owned by the taxpayer and the bailed improvements are neither under the lien nor subject to seizure or sale for payment of the tax. But this settled law is brushed aside and it is said, notwithstanding these facts, that, in some indefinable way, Pennsylvania has in truth levied an *ad valorem* tax upon property of the United States which is in the possession of Mesta as bailee. This is nothing in substance but to say, in the teeth of the *Dravo* and *King & Boozer* cases, that if a tax levied upon a contractor of the Government imposes a burden upon the Government's activities it violates the constitutional immunity and must be stricken down. Whereas, in those cases, the court accepted the tax for what it was, viz., a tax upon the contractor and not upon the Government, here, although under state law the liability to the State is that of the contractor and his property, and can, in no event, be the liability of the Government or its property,—except as the Government either

contractually assumes the burden or bears it as an incident of the contractor's burden,—the court announces that the tax is laid on the Government's property.

I think the case was decided by the court below on a nonfederal ground. The decision is pitched solely upon the character and incidence of the real property tax of the Commonwealth. As that court, in the light of a hundred years of history, defined the tax and the tax lien neither was laid upon or collectable from the United States or its property. As a result of that decision Mesta became liable for an increased tax as a result of certain transactions with the Government. Unless the doctrine of immunity from consequent burden on the Government, as the other party to the contract, is to be reimported into our jurisprudence, the appeal should be dismissed because the decision below was based upon an adequate nonfederal ground.

Mr. Justice Frankfurter, dissenting:

I should like to add a few words to the opinion of my brother Roberts, with which, in the main, I agree.

This controversy is treated by the Court as though it presented a challenge by Pennsylvania to the authority of the United States. The case is not entitled, on the facts as I understand them, to have such importance attributed to it. We are all agreed that a State must subordinate its policies to the constitutional powers duly exercised by the United States. War of course evokes powers of government not available in times of peace, but it is no less true of the war powers of the Government than of the peace powers that the Constitution and the laws enacted in accordance with it are "the supreme Law of the Land." United States Constitution, Art. VI.

Implicit in our federal scheme is immunity of the Federal Government from taxation by the States. After having long been the subject of differences of opinion, the

extent of this implied immunity was greatly curtailed. The basis of the doctrine was shifted from that of an argumentative financial burden to the Federal Government to that of freedom from discrimination against transactions with the Government and freedom from direct impositions upon the property and the instrumentalities of the Government. The decisions in *James* v. *Dravo Contracting Co.*, 302 U. S. 134, and *Alabama* v. *King & Boozer*, 314 U. S. 1, mean nothing unless they mean that it is not enough that the Government may ultimately have to bear the cost of a part or even the whole of a tax which a State imposes on a third person who has business relations with the Government, when a State could impose such a tax upon such a third person but for the fact that the transaction which gave rise to it was not with a private person but with the Government. So much for the scope of the implied immunity of the Government from state taxation as I understand the decisions to date. But in carrying on effectively the task committed to it, the United States can, I believe, go beyond the judicial doctrine of implied immunity from taxation. I have no doubt that Congress, by appropriate legislation, could immunize those who deal with the Government from sales and property taxes which States otherwise are free to impose.

On the record before us, Pennsylvania has not challenged the implied immunity of the Federal Government from taxation nor has she sought to tax that which Congress has said should be free from taxation. Pennsylvania has not taxed property owned by the Government. Pennsylvania has not used her otherwise unquestioned power of taxation to discriminate against one dealing with the Government. Finally, Pennsylvania has not tried to impose a tax which Congress, in order to facilitate war production, has forbidden the States to levy.

Pennsylvania merely seeks to enforce a tax assessment against the owner of lands and buildings in the manner in which she has made such an assessment for one hundred years. She has assessed real property concededly owned by Mesta at a valuation increased by the value of the machinery made available to Mesta by various arrangements with the Government. But it is the realty that is being taxed, precisely as other realty is taxed, and by precisely the same method of determining the value of other realty. If the machinery which has here been affixed to the land through arrangements with the Government had been machinery that belonged to Remington Arms and Mesta had been operating through Remington as a sub-contractor for the Government, I suppose no one would doubt that Pennsylvania could assess the value of the land taxed against Mesta as it was here assessed, quite regardless of the retention of the title by Remington of the annexed fixtures, the value of which served to enhance the amount at which the land was assessed. It cannot alter the nature of the tax as a tax against Mesta's ownership of the land and buildings whether the enhancing fixtures belong to the Government or to Remington. Constitutional answers do at times turn on a nicety but not on a nicety without at least a nice significance.

The case thus appears to me one that was decided by the Pennsylvania Supreme Court on the settled construction of the Pennsylvania statute as a tax on realty, and not at all as a tax on the only thing that belongs to the United States, namely, machinery annexed to the realty. Here also "there can be no pretence that the Court adopted its view in order to evade a constitutional issue, and the case has been decided upon grounds that have no relation to any federal question." *Nickel* v. *Cole,* 256 U. S. 222, 225. The only interest which the State here taxed was an interest within the power of the State to tax; it was not a

federal interest.  See *Elder* v. *Wood*, 208 U. S. 226, 232; *New Brunswick* v. *United States*, 276 U. S. 547.  The rate at which that interest was taxed is equally a matter for Pennsylvania to determine.  In view of the *Dravo* case, *supra*, and *Alabama* v. *King & Boozer, supra*, there is not before us a constitutionally immunized burden of the Government.  Insofar as the financial burden has been directly assumed by the Government it has been so assumed by arrangements which the contracting officers of the Government saw fit to make with Mesta.

In respect to the problem we are considering, the constitutional relation of the Dominion of Canada to its constituent Provinces is the same as that of the United States to the States.  A recent decision of the Supreme Court of Canada is therefore pertinent.  In *City of Vancouver* v. *Attorney-General of Canada*, [1944] S. C. R. 23, that Court denied the Dominion's claim to immunity in a situation precisely like this, as I believe we should deny the claim of the Government.