[L. A. No. 20527. In Bank. Jan. 20, 1950.]

TIMM AIRCRAFT CORPORATION, Respondent, v. H. L. BYRAM, as County Tax Collector, etc., et al., Appellants; UNITED STATES OF AMERICA, Intervener.

Ray L. Chesebro, City Attorney, Louis A. Babior, Deputy City Attorney, Harold W. Kennedy, County Counsel, A. Curtis Smith, Assistant County Counsel, and James A. Cobey, Deputy County Counsel, for Appellants.

Tom C. Clark, United States Attorney General, Theron Lamar Caudle, Assistant United States Attorney General, George A. Stinson, Berryman Green, Special Assistants to the United States Attorney General, James M. Carter, United States Attorney, Ronald Walker, Clyde C. Downing and George M. Bryant, Assistant United States Attorneys, for Respondent and Intervener.

TRAYNOR, J.—Defendants levied ad valorem taxes for the year 1944-1945 on a bank deposit of plaintiff Timm Aircraft Corporation assessed to it as a solvent credit. Timm paid the taxes under protest and then brought this action to recover them, contending that the deposit was owned by the United States and was constitutionally exempt from taxation by a state or its subdivisions. Judgment was entered for Timm, and defendants appeal.

Under a contract with the War Department Timm manufactured military aircraft on a cost-plus-a-fixed-fee basis. The contract provided that Timm was not an agent of the United States but an independent contractor at all stages of the manufacture, including the acquisition of materials and the furnishing of labor. Title to all completed work was in the United States and title to all material, equipment, and supplies for which Timm was entitled to reimbursement vested in the United States upon delivery to Timm. The United States could elect to terminate the contract for Timm's failure to prosecute the work with promptness and diligence or when "conditions arise which make it advisable or necessary in the interest of the Government that work be discontinued under

this contract." If the United States elected to terminate the contract, it was obligated to make full and prompt settlement of Timm's claims for reimbursement of expenditures before termination, and of all claims against Timm for obligations incurred by it in the performance of the contract.

To provide Timm with the necessary funds to perform the contract, the United States by two supplemental agreements dated April 13, 1942, and March 13, 1943, agreed to make advance payments to Timm of sums not to exceed the amount specified in the agreements. Timm was required to furnish adequate security for the payments and to deposit the funds in a special bank account or accounts "separate from the contractor's general or other funds." The payments were to be used "by the contractor exclusively as a revolving fund for carrying out the purposes of the principal contract and any amendments thereto and not for any other business of the contractor." If the United States terminated the principal contract, Timm was obligated to repay the balance remaining in the account and the United States retained "a lien upon such balances to secure the repayment of the advances, which lien shall be superior to any lien of the bank or any other person upon such account or accounts." Withdrawals from the account were subject to previous approval by the contracting officer or his representative to insure that the funds would be withdrawn only for the purposes of the principal contract.

Pursuant to these agreements three-party deposit agreements were executed by Timm, the United States, and the California Bank of Los Angeles, under which the advance payments were deposited to Timm's account, subject to the terms of the supplemental agreements. Checks drawn on the account had to be countersigned by the contracting officer, whose signature indicated the requisite approval of the withdrawal. Timm periodically drew checks on the special account for the estimated amount of current expenditures. Upon certification by Timm that the funds were to be used for the specified purposes, the contracting officer countersigned the checks. Timm then deposited these checks to its operating account, from which it paid obligations incurred in the performance of the contract. Vouchers for these expenditures were then forwarded to the contracting officer, and after verification and approval the special account was replenished in the amount of the funds so expended. At all times, the

amount of the special deposit, plus the amount in Timm's operating account, and the aggregate amount of the outstanding vouchers, was equal to the total advanced to Timm under the agreements. The taxes were levied on the balance on deposit in the special account on the tax day.

Defendants contend that the deposit was not the property of the United States, that it was owned by Timm, and that Timm's interest in the funds deposited was of substantial value to it. Upon examination of the agreements and the statutes under which the advance payments were made, it is our conclusion that this contention is correct, and that the judgment of the trial court must be reversed.

A state tax upon the property or receipts of a private contractor can no longer be avoided on the doctrine of intergovernmental tax immunity merely because the United States eventually bears the burden of the tax. "The asserted right of the one [government] to be free of taxation by the other does not spell immunity from paying the added costs, attributable to the taxation of those who furnish supplies to the Government and who have been granted no tax immunity." (*Alabama* v. *King & Boozer*, 314 U.S. 1, 9 [62 S.Ct. 43, 86 L.Ed. 3, 140 A.L.R. 615]; *Smith* v. *Davis*, 323 U.S. 111, 116 [65 S.Ct. 157, 89 L.Ed. 107]; *Curry* v. *United States*, 314 U.S. 14, 18 [62 S.Ct. 48, 86 L.Ed. 9]; *James* v. *Dravo Contracting Co.*, 302 U.S. 134, 160 [58 S.Ct. 208, 82 L.Ed. 155, 114 A.L.R. 318]; *Metcalf & Eddy* v. *Mitchell*, 269 U.S. 514 [46 S.Ct. 172 70 L.Ed. 384]; *Kaiser Co.* v. *Reid*, 30 Cal.2d 610, 628-629 [184 P.2d 879].) In the absence of an express congressional grant of immunity, the tax in question may be avoided only if it is imposed on property of the United States or is so measured by such property as to be in substance and effect a tax thereon. (*United States* v. *Allegheny County*, 322 U.S. 174, 186 [64 S.Ct. 908, 88 L.Ed. 1209]; see Powell, *The Remnant of Intergovernmental Tax Immunity*, 58 Harv. L.Rev., 757, 773-787; *cf.*, *New York* v. *United States*, 326 U.S. 572 [66 S.Ct. 310, 90 L.Ed. 326].)

To perform its obligations under the contract, Timm had to make large expenditures for labor and materials. It could not have done so without outside help in view of the time that would elapse before reimbursement. It could have borrowed from a private lender on the strength of the contracts and deposited the money to its account to cover future expenditures. Had it done so, it would clearly have been regarded as the owner of the account for tax purposes despite

any obligation to use it only to finance its performance of the contract. Since interest charges on a private loan, however, would have increased the cost of manufacture to the United States, the Secretary of War chose to pay a part of the contract price to Timm in advance of the expenditures. Timm is no less the owner of the account for tax purposes because the funds were provided by the United States rather than by a private lender.

 In view of the prohibition of advances of public funds (Rev. Stats. § 3648, 31 U.S.C.A. § 529), special statutory authorization for payment of advances under war contracts was necessary. Congress therefore authorized the making of "*advance,* progress and other *payments* upon such contracts of any per centum of the contract price." (50 U.S.C.A. App. §§ 611 [55 Stats. 839], 1151 [54 Stats. 676], 1171(c) [54 Stats. 712]; Exec. Order 9001 [6 Fed. Reg. 6787], §§ 1, 3. Italics added.) Identical provisions in statutes authorizing advance payments have been construed as authorizing passage of title to the contractor as "payments of sums that are expected to become due on the contract, and in the ordinary course of events do become due and are applied accordingly." (*Enright* v. *United States,* 54 F.2d 182, 188; *United States* v. *Butterworth-Judson Corp.,* 267 U.S. 387 [45 S.Ct. 338, 69 L.Ed. 672].) The United States retains only an equitable lien upon the funds superior to all other liens. (*United States* v. *Butterworth-Judson Corp., supra,* 393.)

 Moreover, the terms of the supplemental agreement by which the advances were paid to Timm are consistent only with a holding that title to the deposited funds passed to Timm. The agreement expressly gave the United States a lien upon the funds superior to any and all other liens to secure their repayment under certain contingencies. The ownership of a lien on personal property precludes legal title in the lienor. (Civ. Code, § 2888; *Standard Auto Sales Co.* v. *Lehman,* 43 Cal.App. 763, 766 [186 P. 178].) Subject to the approval of the contracting officer, Timm was to use the account "as a revolving fund for carrying out the purposes of the principal contract," to pay the obligations necessarily incurred in performing the contract that Timm would otherwise have had to pay from its general funds. The obligations to be paid were Timm's, not those of the United States. The provisions by which Timm agreed to repay the funds to the United States upon certain contingencies carry

the implication that it was Timm and not the United States that held title to those funds.

Plaintiff contends that the restrictions imposed upon the use of the funds are so general that Timm cannot be said to be their owner for tax purposes. The restrictions relied upon are: (1) the limitation of the use of the deposit account to the purposes of the principal contract; (2) the condition that withdrawals from the account be subject to previous approval by the contracting officer to insure that the funds be used only for those purposes; (3) the condition that the funds must be returned to the United States in the event it chose to cancel the principal contract. ■ The imposition of reasonable restrictions upon the use of property, even the retention of legal title to secure performance of an executory contract, does not make the United States the owner of that property for tax purposes. (*S.R.A., Inc.* v. *Minnesota,* 327 U.S. 558, 570 [66 S.Ct. 749, 90 L.Ed. 851] ; *Eisley* v. *Mohan,* 31 Cal.2d 637, 643 [192 P.2d 5] ; *Dept. of Veterans' Affairs* v. *Board of Supervisors,* 31 Cal.2d 657 [192 P.2d 22] ; *Kaiser Co.* v. *Reid,* 30 Cal.2d 610, 625 [184 P.2d 879].) "The form of the transfer is immaterial; the determinative question is whether private rights have supplanted those of the government insofar as the use of the property is concerned." (*Eisley* v. *Mohan,* 31 Cal.2d 637, 643 [192 P.2d 5].) There can be no doubt here that it was Timm that used the property. It decided what materials were to be acquired, the source of their acquisition and terms of payment therefor, the wages to be paid and the method of their payment. The United States retained the right of supervision only to insure that the funds would not be used for purposes foreign to the principal contract but would "serv[e] their highest and best use." This limitation does not affect their ownership. (*Kaiser Co.* v. *Reid,* 30 Cal.2d 610, 625 [184 P.2d 879].)

■ The provision giving the United States the right to cancel the principal contract and compel the return of the funds is common to all war contracts in recognition of the contingency of a sudden termination of the war. The advances in *United States* v. *Butterworth-Judson Corp.,* 267 U.S. 387, 389 [45 S.Ct. 338, 69 L.Ed. 672], were subject to the limitation that "The United States reserved the right to cancel the agreement at any time that its need for the plant or output ceased." Despite that limitation the court found that the private contractor held the title to the deposit account. A similar provision in *Alabama* v. *King & Boozer,* 314 U.S.

1 [62 S.Ct. 43, 86 L.Ed. 3, 140 A.L.R. 615], did not make the contractor the purchasing agent of the United States even though the United States was to reimburse the contractor for the purchase price of materials bought by the contractor and would have to pay the sales tax whose levy thereon the court sustained. In *Kaiser Co.* v. *Reid,* 30 Cal.2d 610 [184 P.2d 879], this court sustained an ad valorem tax on the interest of the plaintiff in land and shipyard facilities leased to it by the United States. It was contended that the plaintiff had no taxable interest therein because of the reservation by the lessor of the right to cancel the contracts and retake possession of the yards at its election. This court rejected that contention, stating that this reservation was designed only to ''protect the government in case of a short war or plaintiffs' inability to construct vessels properly. So pertinent in this regard is the testimony of the regional counsel for the commission before the boards of equalization: 'In fighting a war, of course, the only reason for changing a contractor—that is, that would be justifiable—would be that the contractor wasn't doing his job.' '' (30 Cal.2d 610, 619.) This holding is equally persuasive here.

 It is contended that the present case is distinguished by the fact that the contractor was not free to use the money without prior approval by the government, and that this requirement of prior approval places the fund under the ownership and control of the government. It is not unusual for a creditor who advances money for a specified purpose to require as a condition of the advance that all expenditures be subject to his approval to insure their being made only for that purpose. The situation is analogous to that presented to the United States Supreme Court in the case of *Alabama* v. *King & Boozer,* 314 U.S. 1 [62 S.Ct. 43, 86 L.Ed. 3, 140 A.L.R. 615]. The United States entered into a contract with a builder to construct an Army camp in Alabama on a cost-plus-a-fixed-fee-basis. The builder was to be reimbursed for the cost of all material purchased, and title to the purchased materials vested in the United States upon delivery. All purchases were subject to the prior approval of the contracting officer, in the same manner and for the same purpose as in the present case. The builder purchased lumber from King and Boozer with the approval of the contracting officer for use under the principal contract. Alabama's effort to collect a sales tax on the transaction was resisted on the theory that

the builder purchased the materials as agent of the United States and that the tax was invalid because it was levied upon a purchase by the United States. If the right of prior approval of the manner in which expenditures are made constitutes ownership of the funds expended, it would follow that purchases made with that approval are made by the purchaser as agent of the one whose approval must be secured. That contention, however, was rejected:

"But however extensively the Government may have reserved the right to restrict or control the action of the contractors . . . neither the reservation nor the exercise of that power gave the contractors the status of agents of the Government to enter into contracts or to pledge its credit." (314 U.S. 1, 13; *Curry* v. *United States,* 314 U.S. 14, 18 [62 S.Ct. 48, 86 L.Ed. 9].) The reasoning of the court is clearly applicable to the present case and compels the conclusion that Timm was in fact the owner of the funds.

Timm also contends that even if it has a property interest in the deposit, that interest is of no value to it. On the contrary, it was of substantial value to it. It enabled Timm to purchase the materials and hire the labor necessary to the performance of its contract, for which it was to receive a substantial fee. Had its general funds on hand been adequate, it could hardly have avoided taxation thereof by contending that they were valueless to it because they were used only for the performance of the government contract. As this court stated in *Kaiser Co.* v. *Reid,* 30 Cal.2d 610, 625 [184 P.2d 879], where plaintiff urged that its interest in property leased from the United States had no value because no profit was directly derived from its use, "even assuming that plaintiff did not make any 'profit' out of the shipyards as such, but only out of its 'services' in performing the construction work, that fact would not negative the propriety of an assessment based on its 'beneficial use' of the property as an entrepreneur engaged in the management of a business enterprise. Plaintiff had a property interest in the shipyards by virtue of its 'exclusive use and possession' thereof. . . ." That reasoning applies with equal force here.

The judgment is reversed.

Gibson, C. J., Shenk, J., and Spence, J., concurred.

EDMONDS, J.—In my opinion, the special bank account was the property of the United States government, and there-

fore erroneously taxed as belonging to Timm Aircraft. The fact that the United States government could have the funds in the account returned to it at any time when, ". . . in the opinion of the Chief of the Air Corps, or his duly authorized representative, the unobligated balance of the advance payments made by the Government . . . exceeds the amount necessary for the current needs of the Contractor, as determined by the Chief of the Air Corps, or his duly authorized representative. . . ." (Supplemental Agreement, No. 1, line 89) is inconsistent with any other view.

However I cannot agree that the aircraft company followed the proper procedure in seeking relief under sections 5136-5143 of the Revenue and Taxation Code. The mode of recovery for taxes erroneously or illegally collected from one not the owner of the taxed property is specified by sections 5096-5107 of the Revenue and Taxation Code. Timm Aircraft did not comply with these sections. It filed no claim for refund, as the statute requires and, for that reason, is not entitled to recover the amount which it paid.

The first question for determination in measuring the corporation's right to recover is whether the payment made by it was a voluntary one. As stated by Mr. Justice Shenk in *Southern Service Co., Ltd.* v. *Los Angeles County,* 15 Cal.2d 1, 7, 8 [97 P.2d 963] : "It is the settled law of this state that illegal taxes voluntarily paid may not be recovered by the taxpayer in the absence of a statute permitting a refund thereof; and in the absence of such statute only illegal taxes paid under duress, coercion or compulsion are considered to have been involuntarily paid and therefore recoverable . . . [T]he filing of a protest with a payment of illegal taxes otherwise voluntarily made does not deprive the payment of its voluntary character. [Citing *Brumagim* v. *Tillinghast,* 18 Cal. 265, 269, 271, 275 [79 Am.Dec. 176] ; and other authorities]." To the same effect is *Security Nat. Bank* v. *Young* (C.C.A. 8th), 55 F.2d 616, 619 [84 A.L.R. 100].

In deciding the Brumagim case, *supra,* page 271, this court said : "The illegality of the demand paid constitutes of itself no ground for relief. There must be, in addition, some compulsion or coercion attending its assertion, which controls the conduct of the party making the payment. . . . If he voluntarily pay an illegal demand, knowing it to be illegal, he is of course entitled to no consideration ; and if he voluntarily

pay such demand in ignorance or misapprehension of the law respecting its validity, he is in no better position, for it would be against the highest policy to permit transactions to be opened upon grounds of this character.'' The later decisions were reviewed at length in the Southern Service case. Uniformly they hold that a payment of taxes under the circumstances shown by the present record, although made under protest, is a voluntary one.

Statutory authority for the refund of taxes ''erroneously or illegally collected'' dates from 1872 when the Legislature enacted section 3804 of the Political Code. As later amended, and in effect for many years, it allowed a refund only upon a claim, verified by the person who paid the tax, and filed within three years thereafter.

In 1893, the Legislature enacted section 3819 of the Political Code. It declared that ''. . . the owner of any property assessed . . . who may claim that the assessment is void in whole or in part, may pay the same to the tax collector under protest, . . . and when so paid under protest, the payment shall in no case be regarded as voluntarily payment.'' By other provisions of the section, ''And such owner may at any time within . . . six months after such payment bring an action against the county, . . . to recover back the tax so paid under protest; . . . .''

Sections 5096 to 5107 of the Revenue and Taxation Code have continued in effect the provisions of section 3804 of the Political Code. The Legislature also placed in section 5136 et seq., of the new code, the procedure authorized by section 3819 of the Political Code, allowing a property owner to pay, under protest, the amount of a tax and then sue to recover it. But now, as at the time the legislation was included in the Political Code, the statutes apply to different situations. Section 5096 et seq., of the Revenue and Taxation Code do not limit to an owner of property the right to recover a tax ''erroneously or illegally collected.'' However, they require, as did the predecessor statute, the filing, within a specified time, of a verified claim by the person who paid the tax. The later statutes based upon section 3819 of the Political Code, by their terms, relate only to a ''property owner.''

This distinction was expressly recognized in *Warren* v. *San Francisco,* 150 Cal. 167 [88 P. 712], which held: ''Section 3819 [now sections 5136-5143, Revenue and Taxation Code] has no application. That section provides that the 'owner' of any property assessed, who may claim that the assessment

is void, may pay his tax under protest, specifying the grounds of the protest; and that when so paid under protest the payment shall not be regarded as voluntary. The plaintiff herein was not the 'owner' of the land assessed nor of any land bordering or adjoining that portion of Caroline Street . . . ."

This application of the statute has been recognized and adopted by the Federal Court of Appeals of the 9th Circuit (*Southern Calif. Tel. Co.* v. *Hopkins,* 13 F.2d 814, 819), and also by the United States Supreme Court (*Southern Calif. Tel. Co.* v. *Hopkins,* 275 U.S. 393, 399 [48 S.Ct. 180, 72 L.Ed. 329]). In the latter case, Mr. Justice McReynolds said: "Section 3819 gives a remedy to the *owner*; and *Warren* v. *San Francisco,* 150 Cal. 167 [88 P.712], intimates quite strongly that it applies only to actual owners."

It is difficult to see how any conclusion other than that stated in the Warren case logically can be reached, considering the language used by the Legislature. One remedy (Rev. & Tax. Code, §§ 5096-5107) is open to *any person,* including an owner, who pays a tax "erroneously or illegally collected" and thereafter files a verified claim for refund within the specified time. The board of supervisors is authorized to allow such a claim when the facts justify that action. The other procedure (Rev. & Tax. Code, §§ 5136-5143) is applicable only to ". . . *any property owner* . . ." (§§ 5136, 5139). He is not required to file claim, and relief may be given to him only by judgment of the superior court in an action brought within six months after payment of the tax.

I see no valid reason for departing from the construction of a tax statute unanimously placed upon it by the justices of this court in the Warren case 40 years ago and not since challenged. The restriction of the legislation as applying only to "an owner" has been left unchanged by the Legislature, although the statute has been amended in other particulars. Moreover, the decision has been accepted by the Federal Court of Appeals and also by the United States Supreme Court as the law of this state.

Timm Aircraft consistently has maintained that on tax day it was not the owner of the money assessed to it. However, it did not comply with the essential requirements laid down by the Legislature for a nonowner of property who pays a tax erroneously or illegally collected from him. It filed no claim for refund within the time specified, and for that reason it is not entitled to recover.

I therefore concur in the judgment of reversal solely upon the ground that the taxpayer did not follow the procedure entitling it to a refund.

CARTER, J.—I dissent.

The majority opinion holds that the taxing agencies of this state may tax funds which the United States government has allocated for the payment of obligations due contractors on government work before the government has released control of such funds, thus permitting the taxing of funds actually owned and controlled by the United States government. In my opinion such holding is in direct violation of the established rule of reciprocal immunity against the taxation by either the state or federal government of property owned by the other. (*McCulloch* v. *Maryland,* 4 Wheat. 316 [4 L.Ed. 579]; *United States* v. *Allegheny County,* 322 U.S. 174 [64 S.Ct. 908, 88 L.Ed. 1209].)

A brief statement of the facts will suffice. On tax day, the first Monday in March, 1944, plaintiff, a corporation, was engaged in the business of producing military aircraft, and as such it had a contract to manufacture aircraft for the United States dated April 7, 1942, referred to as a "cost-plus-a-fixed fee" contract. Thereunder the plaintiff was to be paid by the government, as an independent contractor, the costs of production plus a fixed fee. In order to provide plaintiff with capital to conduct its operations, supplemental agreements were made under which it was provided that the United States was to "make advance payments" within the limits stated, security for which was to be furnished by plaintiff; that such payments should be deposited in a special bank account which was to be kept separate from plaintiff's general or other funds; that the balance in such account or accounts should be used "by the contractor exclusively as a revolving fund for carrying out the purposes of the principal contract and any amendments thereto and not for other business of the contractor"; that withdrawals from such special account or accounts should "be made subject to the prior written approval of the contracting officer or his duly authorized representative"; that any balances in such account or accounts should "secure the repayment of the advances" and that the government should "have a lien upon such balances to secure the repayment of such advances, which lien shall be superior to any lien of the bank or any other person upon such account or accounts by virtue of assignment to it of such con-

tract or otherwise"; that the bank should not be liable "for the withdrawal of any funds from said special account upon checks, properly endorsed and signed by the contractor, except that after the receipt by the bank of written directions from the Chief of the Air Corps, or his duly authorized representative, the bank shall act thereon and be under no liability to any party hereto for any action taken in accordance with the said written directions"; that any excess money should be "repaid by the contractor to the Government" under certain circumstances specified in the contract; that in the event of cancellation of the principal contract the contractor should "return to the Government" the unliquidated balance of any advance payment; that in the event it was determined that the advance payments exceeded the amount necessary for the current needs of the contractor, the excess should "be promptly returned to the Government."

Pursuant to the agreement, arrangements were made with a bank wherein it was agreed that a special account in plaintiff's name was to be set up for the advances and paid out in accordance with the agreements. The government advised the bank that no checks drawn on the account by plaintiff were to be honored unless countersigned by the named federal officer.

On the first Monday in March, 1944, there was $453,353.43 in the account and the defendant county of Los Angeles levied an ad valorum property tax thereon against plaintiff of $453.35, which it paid under protest.

Plaintiff and intervener, United States, claim and the trial court found, that the account belonged to the government and plaintiff had no taxable interest therein, and that if it had an interest, such interest was of no value to plaintiff; that therefore the account was illegally taxed to plaintiff.

Whether or not the account (the debt of the depository bank) belonged to the government or to plaintiff depends upon the agreements. The basic cost-plus-fixed-fee contract provides that advance payments "may" be made *when the federal officer "deems such action necessary,"* and if made shall be in terms prescribed by the officer. The government may terminate the contract at any time. Under the supplemental agreements, it is provided that advances shall be made and a special account created, but also that *"Withdrawals from such special account or accounts shall be made subject to the prior written approval of the Contracting Officer or his duly*

*authorized representative.*'' If the amount in the account exceeds, *''in the opinion''* of the federal officer, the amount necessary, the excess must be returned to the government and under the special account agreement with the bank, the money is to be paid out as set forth in the agreements.

The foregoing provisions of the agreements point unerringly to the conclusion of the trial court that there was no vestige or incident of ownership in plaintiff of the special account. Contrasted with the facts here are the circumstances present in *Kaiser Co.* v. *Reid,* 30 Cal.2d 610 [184 P.2d 879], where this court repeatedly stressed the right of ''exclusive possession'' held by a lessee from the United States, and it was that right of possession upon which the tax was levied. While it is true that the United States was to have a lien on the account, which indicates lack of ownership in it, that the account stood on the bank's records in plaintiff's name but only nominally, and that the moneys deposited in the account were spoken of as ''advances,'' yet withdrawals from the account *were wholly under the control of the government.* Plaintiff did not have the right of use, possession, or title, all incidents of ownership. The exercise by it of any of those prerogatives of ownership was completely under the control of the United States. Therefore, plaintiff had no interest equitable or legal in the account and likewise it was not a solvent credit belonging to it. To be such a credit, it would have to be payable to plaintiff without any strings or conditions attached. It is apparent that the ''advances'' to the account were not really advances as ordinarily understood, that is, a *payment* before due date, for they were not payments to plaintiff inasmuch as that would imply possession and right to use the sums paid. But the account was then not usable by plaintiff without the prior permission of the government. An advance, as that term is ordinarily used, was thus not made until withdrawals had been made from the account. Then and then only was a payment made. The account was a mere field or local arrangement whereby the government had the funds on the spot where needed, thus facilitating their disbursement at a time when fast action was of the essence.

The cases relied upon by Justice Traynor are not in point. In *Kaiser Co.* v. *Reid,* 30 Cal.2d 610 [184 P.2d 879], as above stated, the contractor leasing from the government was in possession of the property and had the right of *exclusive* use thereof. Here, Timm is neither in possession of the account, nor does it have any right of use unless the government so

wishes, let alone an exclusive right. In *Enright* v. *United States*, 54 F.2d 182, the advance payments *had already been made* to the contractor. They were not in an account over which the government had control. *United States* v. *Butterworth-Judson Corp.*, 267 U.S. 387 [45 S.Ct. 338, 69 L.Ed. 672] is clearly distinguishable. The payments were there *made* to the contractor, thus title passed. They were not in an account under the government's control. In *Alabama* v. *King & Boozer*, 314 U.S. 1 [62 S.Ct. 43, 86 L.Ed. 3, 140 A.L.R. 615], the sole question was whether a contractor was an agent for the government when it purchased property to fulfill its contract with the government, the title to which passed to the latter on acquisition, and thus whether a sales tax on the sale of the property was valid. Plainly, the property was purchased by the contractor for *his* use in fulfilling *his* contract, and thus it was a sale to him and hence taxable. For illustration, it is said *immediately following* the quotation therefrom by Justice Traynor: "It can hardly be said that the contractors were *not free to obligate themselves for the purchase* of material ordered. *The contract contemplated that they should do so* and that the Government should reimburse them for their expenditures. It is equally plain that they *did not assume to bind the Government to pay* for the lumber by *their* order, approved by the Contracting Officer, which stipulated that *it did not bind or purport to bind the Government*. The circumstance that the title to the lumber passed to the Government on delivery *does not obligate* it to the contractor's vendor under a cost-plus contract more than under a lump sum contract . . . We cannot say that the contractors were not, or that the Government was, bound to pay the purchase price, or that the contractors were not the purchasers on whom the statute lays the tax." [Emphasis added.] In the instant case the account was not Timm's for it could not be used except upon the approval of the government.

It is urged by appellant, and Mr. Justice Edmonds holds, that the instant action cannot be maintained by plaintiff because it fails to qualify under the statute permitting an action to recover taxes paid under protest by the owner of the property erroneously assessed. Plaintiff did not proceed under the claim for refund provisions of the statute. Its action is pursuant to the following provision: "After taxes are payable, any property owner may pay the taxes on *his property* under protest. A payment under protest is not a

voluntary payment." (Rev. & Tax. Code, § 5136.) Section 5137 of that code authorizes the action when the tax is paid under protest, and the following section reads: "The action may be brought only: (a) As to the portion of the assessment claimed to be void. (b) On the grounds specified in the protest. (c) By the owner, his guardian, executor, or administrator." (Rev. & Tax. Code, § 5139.) The refund provisions authorize the making of a claim for refund to the board of supervisors (Rev. & Tax. Code, §§ 5096-5097), and an action by the taxpayer if the claim is disallowed (*id.*, 5103).

There are various considerations which clearly point to the conclusion that the word "owner" as used in the provisions for recovering a tax paid under protest (Rev. & Tax. Code, § 5136 et seq., *supra*), must be interpreted to include a person who both paid the tax and is the one against whom the assessment was levied. The remedies by way of claim for refund and payment under protest are cumulative. (*Brill* v. *County of Los Angeles,* 16 Cal.2d 726 [108 P.2d 443] ; *Birch* v. *County of Orange,* 186 Cal. 736 [200 P. 647] ; *Stewart etc. Co.* v. *County of Alameda,* 142 Cal. 660 [76 P. 481].) Statutory authority for the recovery of a tax levied pursuant to a void assessment paid under protest is "befitting to this more enlightened age" (*Hellman* v. *City of Los Angeles,* 147 Cal. 653, 655 [82 P. 313]), and, being remedial in nature, should be given a liberal construction. (See *Hellman* v. *City of Los Angeles, supra; Stewart etc. Co.* v. *County of Alameda, supra; Brenner* v. *Los Angeles,* 160 Cal. 72 [116 P. 397].) The relief afforded by the payment under protest provisions takes the place of an action for money had and received, eliminating the common law requirement of payment under duress. (*Aalwyn's Law Inst.* v. *San Francisco,* 39 Cal.App. 414 [179 P. 220].) The person against whom the assessment is made, and the person who paid the tax, is the one who has a claim for money had and received inasmuch as he was the payer. If such a person may not recover, then there is no recovery under the payment under protest method, for a person against whom the tax was assessed and who paid it, although not the owner of the property assessed, would never be the owner and would not have the remedy. That is clearly contrary to the liberal spirit of such provisions and would deny what they permit, an action to recover taxes paid under protest where the assessment is void. (See, Rev. & Tax. Code, § 5137(a), § 5139(a), 5141.) The county asserted that plaintiff was the owner of the account and as far as the assessment goes,

it was declared to be the owner. I conclude, therefore, that an assessee of property who pays the tax levied thereon under protest has an action to recover when the assessment was void for lack of ownership in the taxpayer.

The case of *Warren* v. *San Francisco*, 150 Cal. 167 [88 P. 712], relied upon by Justice Edmonds, is not controlling. There the taxpayer was wholly and entirely a volunteer. He paid taxes on property which was not assessed to him and in which he had no vestige of an interest. It was a part of a public street. Moreover, that case failed to give the liberal construction required.

Being convinced that the money in the account here involved was not taxable, and that plaintiff pursued the proper remedy for its recovery, I would affirm the judgment of the trial court.

Schauer, J., concurred.