**Leslie NORTON, a minor, By and Through her guardian ad litem, Karen NORTON, and Karen Norton, individually, Plaintiffs.**

v.

**UNITED STATES of America, et al., Defendants.**

**UNITED STATES of America, Defendant and Third-Party Plaintiff,**

v.

**CLAUDE C. WOOD COMPANY, Third-Party Defendant.**

**No. CV F 83–335–EDP.**

United States District Court, E.D. California.

Aug. 15, 1985.

1/11/85, 4/3/85, 4/12/85, 4/24/85, 5/1/85, 5/2/85, 5/8/85, 5/15/85, 5/21/85, 5/22/85, and 5/31/85.

Richard C. Watters, Miles, Sears & Eanni, Fresno, Cal., for plaintiffs.

Donald Ayer, U.S. Atty., Garland E. Burrell, Jr., Asst. U.S. Atty., Sacramento, Cal., for defendant and third party plaintiff.

Paul Auchard, Chinello, Chinello, Shelton & Auchard, Fresno, Cal., for third party defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PRICE, District Judge.

This action, brought pursuant to the provisions of the Federal Tort Claims Act (28 U.S.C. 2761, *et seq.*), was tried to the Court

sitting without a jury on April 2 and 3, 1985. The case was bifurcated for trial; this phase of the case being addressed to the liability of the defendant United States of America to the plaintiffs, and the liability of the third-party defendant, Claude C. Wood Company, to the third-party plaintiff, The United States of America.

The plaintiffs Leslie Norton, a minor by and through her guardian ad litem, Karen Norton, and Karen Norton, individually, appeared personally and through their attorney Richard C. Watters of Miles, Sears & Eanni. The defendant, United States of America, appeared by and through its attorney, Garland Burrell, Jr., Assistant United States Attorney, of the United States Attorney's Office. The third-party defendant, Claude C. Wood Company, appeared by and through its attorney Paul Auchard of the firm of Chinello, Chinello, Shelton & Auchard.

The Court having heard the testimony of the witnesses and having considered the exhibits admitted into evidence, makes its Findings of Fact and draws its Conclusions of Law, as follows:

## FINDINGS OF FACT

1. Plaintiffs are the lawful heirs of decedent Sanford Norton (hereinafter "Norton").

2. On or before June 11, 1982, the United States of America through the Bureau of Reclamation (hereinafter "Bureau") awarded a contract, among other things, for raising the lining of the San Luis Canal, from one to five feet at numerous locations along the canal. The work was situated at various locations along the San Luis Canal in Merced, Fresno and Kings Counties, California. (Hereinafter this contract is referred to as the "project.")

3. Claude C. Wood Company (hereinafter "Wood") was the successful bidder-contractor on the project for a contract price of $4,731,000.00.

4. That Norton was an employee of Wood on November 16, 1982.

5. In preparation for the commencement and execution of said project, the Bureau prepared specifications pertaining to Wood's activities under the contract. The specifications and other contract documents were admitted into evidence as trial exhibits 19 through and including 19h, and exhibit 6. Insofar as material to this litigation, said specifications provide as follows:

9. MATERIAL AND WORKMANSHIP

(b) All work under this contract shall be performed in a skillful and workmanlike manner.

12. PERMITS AND RESPONSIBILITIES

The Contractor shall, without additional expense to the Government, be responsible for obtaining any necessary licenses and permits, and for complying with any applicable Federal, State and municipal laws, codes, and regulations, in connection with the prosecution of the work. He shall be similarly responsible for all damages to persons or property that occur as a result of his fault or negligence. He shall take proper safety and health precautions to protect the work, the workers and the public, and the property of others. He shall also be responsible for all materials delivered and work performed until completion and acceptance of the entire construction work, except for any completed unit of construction thereof which theretofore may have been accepted. See ¶ h supplement to General Provisions.

h. Clause No. 12.—At the end of Clause No. 12 of the General Provisions, the following is added:

The contractor shall indemnify and hold the Government harmless for any and all losses, damages, or liability including attorney's fees, on account of personal injury, death, or property damage, or claims for personal injury, death or injury, death or property damage of any nature whatsoever and by whomsoever made, arising out of the activities of the contractor, its employees, subcontractors, or agents under the contract, regardless of whether such claim, loss, damage, actions,

cause of actions, expense, and/or liability may be attributable in whole or in part to the fault, failure, or negligence of the contractor, its employees, subcontractors, or agents under the contract.

The rights and remedies of the Government provided in this clause are in addition to any other rights and remedies provided by law or under this contract. . . .

## 13. CONDITIONS AFFECTING THE WORK

The Contractor shall be responsible for having taken steps reasonably necessary to ascertain the nature and location of the work, and the general and local conditions which can affect the work or the cost thereof. Any failure by the Contractor to do so will not relieve him from responsibility for successfully performing the work without additional expense to the Government. The Government assumes no responsibility for any understanding or representations concerning conditions made by any of its officers or agents prior to the execution of this contract, unless such understanding or representations by the Government are expressly stated in the contract.

## 1.4.2. SAFETY AND HEALTH

a. The contractor shall not require any laborer or mechanic employed in the performance of the contract to work under conditions which are unsanitary, hazardous, or dangerous to his health or safety and health standards promulgated by the Secretary of Labor under Section 197 of the Contract Work Hours and Safety Standards Act (40 U.S.C. 327, *et seq.*), as amended and "Construction Standards," published by the Bureau (Bureau of Reclamation). . . . (hereinafter "Standards"—See exhibit 6)

c. The contractor shall submit in writing a proposed safety program in the form and time intervals prescribed in Section 2 of the "Construction Safety Standards."

d. The contractor is responsible for being cognizant of and insuring compliance with the requirements set forth in Subparagraphs a and b above. Such responsibility shall apply to both his operations and those of his subcontractors. When violations of the safety and health requirements contained in these specifications or standards referenced in Subparagraph a are called to his attention by the contracting officer or his authorized representatives, the contractor shall immediately correct the condition to which attention has been directed. Such notice either oral or written, when served on the contractor or his representative(s), shall be deemed sufficient.

e. In the event the contractor fails or refuses to promptly comply with the compliance directive issued under Subparagraph d above, the contracting officer or his authorized representative may issue an order to stop all or any part of the work. When satisfactory corrective action is taken, an order to resume work will be issued. The contractor shall not be entitled to any extension of time, nor to any claim for damage or to additional compensation by reason of either the directive or the stop order. Failure of the contracting officer or his representative to order discontinuance of any or all of the contractor's operations shall not relieve the contractor of his responsibility for the safety of personnel and property.

g. The contractor shall indemnify and hold the Government harmless for any and all losses, damages, or liability on account of personal injury, death, or property damage, or claims for personal injury, death, or property damage of any nature whatsoever and by whomsoever made, arising out of the activities of the contractor, his employees, subcontractors, or agents under the contract. Such indemnity shall include, but shall not be limited to, the failure of the contractor, his employees, subcontractors, or agents to comply with the safety and health provisions contained in these specifications.

h. The rights and remedies of the Government provided in this paragraph are in addition to any other rights and

remedies provided by law or under this contract.

i. In the event there is a conflict between the requirements contained in the Bureau's "Construction Safety Standards," specifications paragraphs, contractor's approved safety program, referenced safety and health codes, and standards, or the U.S. Department of Labor Construction Safety and Health Standards, promulgated under Section 107 of the Contract Work Hours and Safety Standards Act (40 U.S.C. 327, *et seq.*), as amended, the more stringent requirement will prevail.

Additionally, pursuant to the Bureau's Standards, Wood contractually undertook, *inter alia*, the following obligations:

3.1.2. *Foremen.* Prior to initiating a job assignment, supervisors or foremen shall instruct each new employee in the recognition and avoidance of hazards incident to the employee's job assignment.

3.2.6. *Heavy equipment operation.* Heavy equipment operators shall be given instruction in the safe operation of the equipment and shall demonstrate their proficiency in the operation of the equipment. Such instruction and testing shall be carried out on-site, by a qualified representative of the employer, prior to permitting the employee to operate the equipment independently.

3.2.9. *General.* Employees exposed to hazards such as those previously listed or engaged in hazardous occupations, ... shall be thoroughly acquainted with the specific hazards and instructions in the pertinent provisions of this manual relating to exposure. The employer is responsible for such instruction together with ensuring that the employee possesses the necessary qualification, license, and/or permit required to perform such work.

3.3 SAFETY MEETINGS

3.3.1. *Supervisors.* The contractor shall conduct regularly scheduled supervisory safety meetings at least monthly at all levels of job supervision. An outline report containing subject matter and attendance shall be maintained by the contractor, and available for review by the Contracting Officer's representative.

3.3.2. *Employees.* A minimum of one "on-the-job" or "toolbox" safety meeting shall be conducted weekly by each field supervisor or foreman and shall be attended by all employees under their supervision. The contractor shall maintain a record of these weekly meetings.

2.7 JOINT SAFETY POLICY COMMITTEE. The Contracting Officer's representative, the contractor's principal on-site representative, and designated members of their respective staffs shall participate in scheduled monthly safety meetings. These meetings shall be used to review the effectiveness of the contractor's safety effort, to resolve health and safety problems relating to current operations, and provide a forum for planning safe future construction activities.

2.8 SAFETY PERSONNEL. When the contract does not require the services of a full-time safety engineer, the contractor shall designate a competent and dependable supervisory employee, satisfactory to the Contracting Officer, to administer his safety program. However, should the contractor's safety effort be considered inadequate, the Contracting Officer may, at his option, require the contractor to employ a fulltime, qualified safety engineer in lieu of a safety representative. Further provision is made in this manual for the use of environmental health and safety specialists where special or technical expertise is required.

2.9 SAFETY INSPECTION. The contractor shall provide for frequent and regular safety inspections of the work sites, materials, and equipment by competent employees.

19.2.3 *Speeds.* Vehicles and mobile equipment shall not be operated at speeds greater than are reasonable and safe considering weather conditions, traffic, road conditions, type and conditions of equipment, etc. The operator must have the equipment under control at all

times and be able to stop it within the clear-sight distance.

19.2.5 *Parking.* No vehicle or equipment shall be stopped, parked, or left standing on any road or in any location in such a manner to endanger personnel or property. Vehicles and equipment shall not be left unattended unless the motor has been shut off, brakes securely set, and the gears engaged. When parked on a hill or grade, the wheels shall be turned into the curb or the wheels chocked.

19.3 MAINTENANCE

19.3.1 *Requirement.* Prior to initial use, machinery and mechanized equipment shall be inspected and tested by qualified personnel to determine if it is in safe operating condition. The contractor shall initiate and carry out a scheduled maintenance program for vehicles and mechanized equipment, using competent mechanics or technicians. Where there is evidence of poor or inadequate maintenance, the Contracting Officer's representative may require certified reports indicating the date and type of maintenance performed on designated vehicles or equipment.

19.3.2 *Inspection.* Vehicles and mobile mechanized equipment in use shall be inspected at the beginning of each shift to ensure that the following equipment and accessories are in safe operating condition: service brakes including trailer brake connections, parking brakes, tires, horn, steering mechanism, operating controls, restraint systems, and safety devices. This inspection shall also include lights, reflectors, windshield wipers, defrosters, windshields, and coupling devices when such equipment is installed and used. All defects shall be corrected prior to putting the vehicle or equipment into service.

19.3.3 *Removal from service.* Vehicles or equipment found to be in unsafe operating condition shall be immediately removed from service until repaired and reinspected prior to being placed into service again.

19.3.4 *Repair shutdown.* Vehicles and equipment shall be shut down while repairs or adjustments are being made unless operation of the equipment is required in making the repairs or adjustments.

6. The Standards define its scope and purpose, as follows:

1.1 SCOPE. This manual sets forth health and safety standards for all Bureau of Reclamation construction activities and operations. The standards set forth herein are consistent with the health and safety standards prevalent in the industry and those promulgated under section 19 of the Occupational Safety and Health Act of 1970, Public Law 91–596.

1.2 PURPOSE. The purpose of this manual is to promote working conditions and work practices which will ensure all employees a safe and healthful work environment in all construction activities administered by the Bureau of Reclamation.

1.3 APPLICATION. The standards and provisions set forth in this manual are applicable to all construction operations performed by the Bureau of Reclamation, its contractors, and subcontractors.

7. The construction project was spread over a wide area, and was conducted at several sites, separated by several miles. The canal was the scene of the pouring of the cement and the finishing of the poured material, the portion of the work site where the accident in question took place. The cement that was used in the canal was formulated at a batch plant some distance from the canal and was transported there in trucks known in the trade as "transit-mixers."

8. All of the events hereinafter referred to in these Findings of Fact and Conclusions of Law occurred in the State of California and within the boundaries of the Eastern District of California.

9. That the United States of America through the Bureau had employees present at the various work sites of the entire

project, and at the subject accident location, whose functions included, among other things, safety.

(a) Mr. Victor Panam (hereinafter "Panam") was a construction inspector and he was at the accident location at the time of the accident. His job description included, among other things, as follows:

6. Implements the safety program through observance of existent and potential hazards on both Bureau and Contractors' operations and enforces remedial or preventive measures as necessary. Conducts weekly employee group safety meetings.

(Exhibit 1–B–1)

(b) Mr. Harold Naugle (hereinafter "Naugle") who worked at the batch plant had the title of materials engineering technician. His job description (Exhibit 1–B–4) provided in part as follows:

14. Conducts on-the-job 5-minute tool box safety meetings weekly. Observes and enforces safety rules and regulations in the work area as set down by the U.S.B.R. *Construction Safety Manual.*

Naugle's duties were at the batch plant. He was on "loan" out of the Auburn office to the Fresno office for this job. The foregoing job description was not changed or altered when he reported for the Fresno job. He was never told not to perform any of the duties specified in his job description while working on the project.

(c) Mr. Robert C. Hays (hereinafter "Hays") was a materials engineering technician working part time at the batch plant and part time at the subject accident location. One of his duties was to observe and report safety violations.

10. Some time in October of 1982, and prior to Mr. Norton's accident, Hays observed an incident involving Mr. Daniel Caglia (hereinafter "Caglia") and truck number 188, who are the same exact driver and truck involved in Mr. Norton's accident, at the batch plant. Hays observed the subject driver and transit mix truck move forward several feet without a driver in the cab. Hays never reported this incident to anyone prior to Norton's accident. His stated reason for this omission was that he "thought" Wood's employees would report the incident.

11. In October of 1982, and prior to Norton's accident, Naugle observed an accident involving Caglia and truck number 188, the same exact driver and truck involved in Norton's accident, wherein the truck reportedly moved approximately 15 feet and had an impact with a loader. There was no driver in the cab of the truck when this occurred. The truck was in the process of being loaded with cement at the batch plant when this occurred. Naugle did not see the truck move, but did observe it in the at-rest position. Naugle never reported this incident to anyone prior to Mr. Norton's accident.

12. In October of 1982, and prior to Mr. Norton's accident, Naugle observed and participated in placing his hand on the throttle at the rear of the subject transit mix truck, number 188, and activated the throttle and the truck gave a sensation of moving forward. Naugle never reported this incident to anyone prior to Mr. Norton's accident.

13. Each of these incidents occurred at or near the batch plant, where the dry cement was premixed with sand and aggregate and loaded into the transit mixers for mixing while enroute to the canal where it was unloaded into the paving machine for spread on the canal bank.

14. Caglia was, at all times mentioned herein, employed by Wood as a truck driver, driving truck number 188. Caglia requested that the incident described in Finding No. 11 not be reported because he feared he would lose his job.

15. James Davis (hereinafter "Davis") was, at all times mentioned herein, an employee of Wood, at the batch plant operation, and witnessed the incident described in Finding No. 11, *supra.* He did not report the incident because "no damage was done."

16. None of the incidents observed by Hays, Naugle, Davis or Caglia, were re-

ported to anyone of a supervisory capacity by either employees of the United States of America or Wood before Norton's accident for the reasons stated above.

17. A part of Davis' duties at the batch plant was to take reports of needed repairs to Wood's automotive equipment employed in the completion of the project. Wood's repair facilities were located in the immediate vicinity of the batch plant.

18. Caglia did not put in a request to have truck number 188 checked as a result of any of these incidents. However, on November 10, 1982, the evidence shows that a request was made to check the brakes on truck 188. The evidence further shows that the following work was performed on the truck.

Adjust brakes;

Tighten chain;

Check lights.

There is no evidence that any other repairs were made on this truck between October 1, 1982 and the date of the accident.

19. On November 16, 1982, shortly prior to the accident which led to the instant action, Norton was assisting in unloading cement from the concrete transit mixer truck being driven by Glenn Elkins, a Wood employee, which was unloading at the paying machine which was applying cement along the lip-raising portion of the project. While Elkins' truck was unloading the transit mixer being driven by Caglia, number 188, was waiting next in line. Behind Caglia's truck was another transit mixer truck being driven by Junior Rambo, another Wood employee.

20. The customary practice in the construction industry for unloading cement transit mixers at the project construction site is that the transit mixer is driven in close proximity to where the concrete is to be dumped; the concrete mixer driver then sets his brake and places the truck in neutral, exits the cab of the truck and goes to the rear of the truck where he climbs up to the rear barrel and checks the "slurry" (consistency) of the concrete. Depending upon the slurry, the driver may add water by the means of valves located at the rear of the truck. If the water is added, the driver then accelerates the rotation of the barrel by means of a hand gas throttle control located at the rear of the truck which increases the RPM's of the truck engine. This maneuver results in an acceleration of the engine of the vehicle. There is no brake control situate at the rear of the transit mixer. Upon completion of this mixing, the driver reenters the cab until he is notified—usually by hand signal—to pull up to the dump site. There was evidence that this practice is standard in the entire industry and does not vary with the conditions present at the site of the delivery of cement. It is a safe practice so long as the truck does not move forward when the speed of the motor is accelerated while the driver is out of the cab.

21. On the San Luis Canal Lip-Raising Project where the accident occurred, transit mixer drivers had been advised by Wood supervisory personnel to stay out of the work site area unless their truck was actually dumping, although they were not advised of any specific distances to maintain from the dump site. The usual practice of Wood transit mixer drivers on this job was to advance their trucks to some point short of the scaffolding trucks, which was usually about thirty or forty feet short of the paving machine, then check their load in the manner of the usual construction industry practice described above. After reentering the cabs of their truck the transit mixer drivers would then advance to the paving machine upon a hand signal usually given by Sanford Norton.

22. On November 16, 1982, after stopping his transit mixer truck short of the paving machine, Caglia thought that he had set the parking or mixing brake on his truck and placed the transmission in neutral. He also believed he had done these things in October when the incident material in Finding No. 11, *supra,* occurred. He exited the truck and went to the rear of the truck where he checked the sump of his load, added water with the rear hand valve and then advanced the rear hand throttle to

accelerate the rotation of the barrel. The transit mixer truck thereupon unexpectedly accelerated forward, moving a distance variously estimated as 50 to 75 feet before striking Norton. The transit mixer thereupon veered into the San Luis Canal and sank. Norton died as the direct and proximate result of being struck and run over by truck number 188.

23. The transit mix trucks when operating at the paving machine were in the vicinity of approximately 11 workmen who were working either on the ground or in and about a paving machine and a scaffolding truck. The transit mix trucks are large pieces of machinery and the cement alone in these trucks weighs approximately 22,-400 pounds. A transit mix truck when operated in the vicinity of human beings, such as occurred each day on this job-site at the paving machine, constituted a hazard when operated without a driver in position to control the forward motion of the truck, unless the forward motion of the truck was rendered impossible by mechanical means.

24. Panam had observed, prior to Norton's accident, transit mix truck drivers getting out of their trucks while waiting in line to unload their cement at the paving machine. There would be no driver in the cab of the truck while this occurred. He further observed that there were no restrictions as to how far back from the unloading cement mixer at the paving machine the other transit mix trucks were required to wait before their turn came to dump their load. This was reported to no one in a supervising capacity employed by the United States or Wood before Norton's accident; hence no action was taken to remedy either of these situations.

25. That Mr. Walter Kron (hereinafter "Kron") a supervisory civil engineer, employed by the Bureau had observed, prior to Norton's accident, transit mix truck drivers getting out of their trucks while waiting in line to unload their cement at the paving machine. There would be no driver in the cab of the truck while this occurred. He further observed that there were no restrictions as to how far back from the unloading cement mixer at the paving machine the other transit mix trucks had to wait before their turn came about. This was not reported to any of Kron's supervisor before Norton's accident and no action was taken to remedy either of these situations.

26. That attendance at contractor safety meetings by Naugle and Hays was sporadic, at best, prior to Norton's accident.

27. There is no evidence from which the Court can find the cause of the truck to move as described in Findings numbered 10, 11 and 12, above. Such an event, however, can only be caused by driver error, mechanical failure, or a combination of both.

28. Hearsay evidence, which came in without objection, indicated the truck was examined after the accident. The findings from such examination were not introduced into evidence.

29. From the date of his first employment with Wood in the latter part of August or early September of 1982, until November 16, 1982, Caglia made in excess of one hundred trips from the Wood batch plant to the paving machine at the San Luis Canal to dump a load of concrete. On only the occasions described above, did his truck ever move forward while he was outside the cab. Since neither Caglia, Davis, Hays nor Naugle ever reported these incidents to their supervisors, the Wood supervising personnel were unable to check truck number 188 to attempt to establish the causes of these incidents, nor were Bureau personnel permitted to perform their supervising functions of requiring Wood employers to perform any acts which may have prevented Norton's death.

30. After Norton's death, the Bureau and Wood adopted measures to insure the safety of personnel working at the paving site. They included:

(a) Establishing a minimum distance that waiting trucks could approach the paving machine.

(b) Installing a warning device that sounded if a driver left the cab of a transit mixer without:

(1) Setting the maxi-load brake; and

(2) Placing the gear shift in neutral.

31. After Norton's death Naugle and Hays voluntarily reported the incidents described in Findings numbered 10 and 12, to Jack Costello, the Bureau safety engineer who was dispatched to investigate the accident.

## DISCUSSION

The applicable provisions of the Federal Tort Claims Act makes the United States liable for personal injuries caused by the negligent or wrongful acts or omissions of an employee of an agency of the United States, while acting within the scope of his office or employment, if under the same circumstances a private citizen of the forum state would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

■ The parties are in agreement that applying California law, the Court must start from the premise that ordinarily the employer of an independent contractor does not owe the employees of such independent contractor any special duty of care, and will not be held liable for the negligence of the contractor or his employee. *See Thorne v. United States*, 479 F.2d 804 (9th Cir.1973). Likewise, it is settled law in this circuit that the mere reservation of a right to inspect work performed by an independent contractor, including the right to stop the work if precautions are not taken, does not impose upon the government any duty of inspection or control. *Thorne v. United States. Id.*, at 809.

The Ninth Circuit has adopted the ultrahazardous activity exception to the general rule immunizing the hirer of a general contractor enunciated by the Supreme Court in *Van Arsdale v. Hollinger*, 68 Cal.2d 245,

66 Cal.Rptr. 20, 437 P.2d 508 (1968). The California Supreme Court in that case adopted the rule enunciated in Restatement 2nd, Torts 427 (1965), generally referred to as the nondelegable duty exception. Plaintiff argues that that exception is applicable here. The Court does not agree.

The United States argues that (presumably absent the ultrahazardous activity exception adopted in *Thorne, supra*) that the United States has no duty to monitor the contractor's compliance with the safety provisions of the contract in the off-construction site area of the batch plant.[1]

The government cites several cases in support of this proposition. First, the government cites *Nelson v. United States*, 639 F.2d 469 (9th Cir.1980), a case decided under the Suits and Admiralty Act, 46 U.S.C. §§ 741–752. Patently, of course, this case is not applicable to our considerations here. The government next cites *Maltais v. United States*, 546 F.Supp. 96 (N.D.N.Y.1982), *affd. without opinion* 729 F.2d 1442 (2nd Cir.1983); however, a careful reading of the *Maltais* case at 101, indicates that its holding is admittedly contrary to *Thorne v. United States, supra.* Thus, it would appear that there is a split among the circuits as to whether the state court adoption of the nondelegable duty theory as expressed in *Van Arsdale v. Hollinger, supra*, is binding on the United States. Sitting in the Ninth Circuit, of course, we must adopt Ninth Circuit law.

Finally, the government cites *Gowdy v. United States*, 412 F.2d 525, 529 (6th Cir. 1969). A careful reading of *Gowdy* indicates that it, too, is another expression of the doctrine stated above, namely, that the mere reservation of the right to inspect does not impose a duty to inspect.

■ Unfortunately, the instant case does not fall into either category, *i.e.*, the cases where the government failed to make an inspection, or alternately, the contracting for ultrahazardous activity. As the Court

---

**1.** The Court is puzzled by this argument. Presumably it is the argument of the government's attorney that nothing that may have happened outside the immediate area where this accident took place and which was witnessed by government employees affects their duty to enforce the provisions of the contract.

has found, if properly performed with equipment that is mechanically sound, the acceleration of the rotating cement drum on the mixer truck by the operator standing at the rear of the truck and away from the steering and braking controls of the truck, is not a hazardous activity. The crux of this case is epitomized by the case extensively cited by Wood's counsel.

In *Stark v. Weeks Real Estate*, 94 Cal. App.3d 965, 156 Cal.Rptr. 701 (1979) (affirmance of defendant's motion of summary judgment), Stark, an employee of an independent contractor, was cut on the arm by an electric skill-saw while performing his duties for the contractor. He sued the partnership owner who had engaged the contractor. The undisputed facts were that plaintiff, in performing this task, had rendered the safety guard of the saw inoperable prior to the accident that proximately caused his injury. The appellate court expressly found that there was nothing inherently dangerous in the use of electric skill-saws if properly equipped and properly handled, just as the Court has here found that there is nothing inherently dangerous in the method adopted to mix the cement by use of the remote controls at the rear of the cement truck, if properly performed and with the equipment in good condition.

However, there are two ingredients present here that were not present in the *Stark* case:

■ First, there is evidence that government employees witnessed prior incidents where the cement mixer truck in question moved forward while not under the direct control of the driver. The Court has expressly found, and there is no evidence to the contrary, that such a situation creates a dangerous condition.

Second, there were government employees who witnessed the prior incident who were either mandated by their job description to report any unsafe conditions to their superiors, or, alternately, were taught to

report such conditions to their superiors. The reason for such instructions and teachings is clear. The contractor's employees may not report such conditions for a variety of reasons. *See* Findings 14 and 15, above. The government employee's report, then, serves an independent safety check to make certain that the appropriate employees of the contractor concerned with job safety may be aware of such conditions and may take steps to remedy them. This omission was negligence.

■ The employees of Wood who failed to report the incidents prior to Norton's fatal accident, were both negligent and violated the terms of Wood's contract with the United States government.

Early on in this case, the parties, by stipulation, filed with the Court a true and correct copy of all of the contract documents. The contract documents provided, among other things, that Wood would prepare and submit to the appropriate officials of the United States a safety program for their approval. The safety program included the pre-prepared document entitled "Your Safety in the Construction Industry" which mandated that all employees should "know the company safety rules and safety rules established by CAL/OSHA or other safety agencies. Under the subdivision "Trucking," the safety program mandated all truck operators to "set hand brake and put transmission in low gears before leaving vehicle."[2] In the hand-out that was submitted to each employee, entitled "Your Safety in the Construction Industry," all employees of Wood were mandated: "Defective equipment, machinery, hazardous conditions or unsafe practices must be reported immediately to your Foreman."

Finally, attached to the specially prepared employees Withholding Certificate (a modification of Form W–4, Department of Treasury, Internal Revenue Service), the Wood employees were required, in addition to the necessary withholding information,

---

**2.** This is contrary to the testimony received at trial. The testimony at trial was that when mixing the cement in the transit mixer or, as

Caglia was doing at the time of this accident, they were to place the transmission in neutral and to set the emergency braking system.

to certify by signature that "Today I have received and read a copy of my employer's Safe Practices and Operations Code. I understand that as a requirement of my employment, I must report any injury which I may receive on the job to my Foreman to obtain first aid or proper medical treatment to prevent further injury or infection." The Code of Safe Practices was set forth in both the English and Spanish languages. The Code of Safe Practices provided, among other things: "4. If you discover a practice or condition that in your opinion is not safe, do not ignore it, report it to your foreman immediately."

Further, as part of the Wood safety program, the pamphlet prepared by the Associated General Contractors of California, contained the same provisions as did the employees' withholding allowance certificate, including the one quoted immediately above.

In the classical formulation of negligence, the omission to do something which a reasonable man, guided by those ordinary considerations which ordinarily regulate human affairs, would do, or the doing of something which a reasonably prudent man would not do. Further, the acts of omission by Wood's employees and the Bureau personnel occurred independently of each other, based upon independent judgments by actors having different obligations and duties, but which must be judged by the same standard. However, these independent acts were concurrent in time.

Of course, the finding of negligence is not the end of the Court's problem in this case. The negligence found must be a proximate cause of the injury sustained, or a vital link in the plaintiff's right to recovery is missing. In analyzing this facet of the case, the Court relies on two factors:

■ 1. *The Contract Itself.* Wood is obligated by the contract to take corrective

action for violations of the safety and health requirements imposed upon Wood or called to his attention by the appropriate officials of the United States. There is no contention by Wood that the Wood supervising employees would not have taken appropriate measures had the matters been called to their attention. Indeed, there is evidence that after the Norton accident happened, the persons directing the job for Wood took such measures.[3] When admitted by the Court during the trial, the Court stated on the record that it was not admitting such evidence on the issue of negligence, and has not considered it as such. Clearly, as stated by the Rule itself, such evidence is admissible to show the feasibility of precautionary measures designed to prevent the reoccurrence of the accident in question. In the Court's view, the evidence is equally applicable to indicate the willingness of Wood's personnel to take appropriate action in the event that the condition that gave rise to this accident had been earlier called to their attention.

Thus, the failure to report the prior incidents by Wood and Bureau personnel proximately contributed to Norton's death.

2. *The Indemnity Question*

A. *The Entitlement of the United States to Indemnity.*

■ In this case, the government's right to indemnity, if at all, arises from an express contract. At the outset we must determine the applicable law which controls the interpretation of this contract. The Supreme Court decided this issue in *United States v. Seckinger,* 397 U.S. 203, 209, 90 S.Ct. 880, 884, 25 L.Ed.2d 224, 232 (1970), stating that:

> Preliminarily, we agree with the Court of Appeals that federal law controls the interpretation of the contract. *See United States v. County of Allegheny,* 322 U.S. 174, 183, 88 L.Ed. 1209, 1217, 64

---

**3.** The Court is cognizant of Federal Rule of Evidence 407, which provides that: "When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment."

S.Ct. 908 [914] (1944);[12] *Clearfield Trust Co. v. United States,* 318 U.S. 363, 87 L.Ed. 838, 63 S.Ct. 573 (1943). This conclusion results from the fact that the contract was entered into pursuant to authority conferred by federal statute and, ultimately, by the Constitution.

n. 12 "The validity and construction of contracts through which the United States is exercising its constitutional functions, their consequences on the rights and obligations of the parties, the titles or liens which they create or permit, all present questions of federal law not controlled by the law of any State." 322 U.S. at 183, 88 L.Ed. at 1217 [64 S.Ct. at 914].

In *Seckinger,* a majority of four went on to state the following cogent rule:

More specifically, we agree with the Court of Appeals that a contractual provision should not be construed to permit an indemnitee to recover for his own negligence unless the court is firmly convinced that such an interpretation reflects the intention of the parties. This principle, though variously articulated, is accepted with virtual unanimity among American jurisdictions. The traditional reluctance of courts to cast the burden of negligent actions upon those who were not actually at fault is particularly applicable to a situation in which there is a vast disparity of bargaining power and economic resources between the parties, such as exists between the United States and particular government contractors. *See United States v. Haskin,* 395 F.2d 503, 508 (C.A.10th Cir.1986).

In short, if the United States expects to shift the ultimate responsibility for its negligence to its various contractors, the mutual intention of the parties to this effect should appear with clarity from the face of the contract. We can hardly say that this intention is manifested by the formulation incorporated into the present contract. By its terms Seckinger

is clearly liable for *its* negligence, but the contractual language cannot readily be stretched to encompass the Government's negligence as well.

*United States v. Seckinger, supra,* at 211–13, 90 S.Ct. at 885–86.[4]

In *Gibbs v. United States,* 599 F.2d 36, 40 (2nd Cir.1979), on the authority of *United States v. Seckinger, supra,* the Court held:

We reluctantly conclude that this language is dispositive of the interpretation of the clause before us. First, the clause contains the terms, "save harmless and indemnify," which, as Justice Brennan indicated, do help show an intent to encompass indemnification for the indemnitee's negligence. Second, the clause obligates the contractor to indemnify the government for "all claims, . . . resulting from . . . any personal injury . . . growing out of . . . any work performed under or related to this contract . . .," which on its face covers the plaintiff's claim here. There are no express exceptions to the broad language. And further, such liability for indemnity exists "regardless of whether such claims . . . may be attributable to the fault, failure, or negligence of the contractor." Apart from an explicit requirement of indemnification for the indemnitee's negligence, it is hard to imagine language stronger for the indemnitee than that contained in the instant clause. Were we writing on a clean slate, we would find attractive the view that only such an explicit reference could support indemnification for the indemnitee's negligence, particularly because of the usual disparity in bargaining power between the government and its contractors, and the government's role as draftsman of the contract. But *Seckinger,* as already indicated, makes clear that that such explicit reference is not required. Thus, we feel compelled to hold that the intention of the parties to

---

**4.** The *Seckinger* opinion unfortunately does not cite the entire language of the contract but merely that the private contractor "shall be responsible for all damages to persons or property that occur as a result of his fault or negligence . . ." The *Gibbs* court, *supra,* found this single clause, however, to be determinative of the parties' intent.

require Kearney to indemnify the government for the negligence of the Postal Service "appear[s] with clarity from the face of the contract," under the applicable federal common law.

The Ninth Circuit has followed *Seckinger* on numerous occasions.[5]

The Court now turns to the second aspect of *Seckinger* that dictates the next step in our analysis. *Seckinger* held that although negligence on the part of the employees of the United States would not bar their rights to indemnity from their indemnitor (in this case Wood) that the United States could not recover from the indemnitor (Wood) for its own negligence, but could only recover to the extent that the indemnitor Wood's negligence contributed to the injury of its own employee. As was stated *Barron v. United States,* 654 F.2d 644, 648–49 (9th Cir.1981):

> It follows, therefore, that in this case the United States, although liable to Maitland's employee to the full extent of his damages, is entitled to recover under its contract for indemnity against Maitland "to the full extent of its [Maitland's] negligence, if any, contributed to the injuries of the employee [Barron]." For the reasons stated in *Seckinger,* it is also true that this provision in the contract does not entitle the United States to obtain indemnity "to the extent that the injuries were attributable to the negligence, if any, of the United States." *Id.* [397 U.S.] at 215, 90 S.Ct. at 887. *See United States v. English,* 521 F.2d 63, 67–68 (9th Cir.1975).

The holding in *Seckinger, supra,* and the Ninth Circuit cases interpreting *Seckinger* clearly provide for the parties to offer admissible evidence in aid of the Court's interpretation of the contract. No such evidence was offered in the instant case. Lacking such evidence, the Court must be bound by the words of the contract as written, and the construction of the contract becomes a question of law.

The language which the Court was interpreting in *Barron, supra,* is precisely the same as the contractual language found in *Seckinger,* to wit, that the contractor "shall be responsible for all damages to persons or property that occur as a result of his fault or negligence."

The contracts to which the Ninth Circuit has applied this principle varied widely in the choice of words used, but contained one salient common feature, *i.e.,* none of them contained an express intention that the indemnitor agreed to indemnify the government for the negligence of the government's employees.

The instant contract is more expansive than any which have been quoted in detail in the appellate opinions. Despite this expansion of the language contained in the instant contract, it is clear that the indemnity clause is limited to "activities of the contractor, his employees, subcontractors or agents under the contract." The indemnity clause continues: "Such indemnity shall include, but shall not be limited to, the failure of the contractor, his employees, subcontractors, or agents to comply with the safety and health provisions contained in these specifications." Again, this limitation speaks only of the acts of the contractor, his employees, agents and subcontractors. It is not expanded to include acts of the employees of the government.

Clearly, then, the holding in *United States v. Seckinger, supra,* is applicable here:

> A synthesis of all of the foregoing considerations leads to the conclusion that the most reasonable construction of the clause is the alternative suggestion of the Government, that is, that liability be premised on the basis of comparative negligence. In the first place, this interpretation is consistent with the plain language of the clause, for Seckinger will be required to indemnify the United States to the full extent that its negligence, if any, contributed to the injuries to the employee.

**5.** *Barron v. United States,* 654 F.2d 644 (9th Cir.1981); *United States v. English,* 521 F.2d 63 (9th Cir.1975); *Howey v. United States,* 481 F.2d 1187 (9th Cir.1973).

... In no event will Seckinger be required to indemnify the United States to the extent that the injuries were attributable to the negligence, if any, of the United States. In short, Seckinger will be responsible for the damages caused by its negligence; similarly, responsibility will fall upon the United States to the extent that it was negligent.

*United States v. Seckinger,* 397 U.S. at 215–16, 90 S.Ct. at 887, 25 L.Ed.2d at 235.

### Wood's Liability for Breach of Warranty

The government seeks total indemnity on an additional theory, *i.e.,* breach of warranty. The government points to the fact that the contract contains a general provision that Wood will perform all work under the contract "in a workmanlike manner." From this provision, the government argues that that creates a duty which is breached if any unsafe or negligent conduct occurs. For this proposition, the government relies on a series of cases arising in the admiralty field having their principal source in *Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp.,* 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956). The principle, while having many of the characteristics of the express indemnity such as the Court has been discussing, has, to the Court's knowledge and research, never been applied outside of the admiralty field by any circuit court.[6]

However, the Supreme Court in *United States v. Seckinger, supra,* at footnote 22 stated:

Because we have taken the view that the rights and liabilities of Seckinger and the United States inter se are governed by contract, we need not reach the Government's alternative theory, rejected by the Court of Appeals, that Secking-

er breached an implied warranty of workmanlike service.

### Wood's Liability for Breach of Contract

Finally, the United States argues Wood's actions constitute a breach of contract, and they are entitled to recover on that ground alone. The case cited and relied upon, namely, *S.F. Unified School Dist. v. Cal Building, etc. Co.,* 162 Cal.App.2d 434, 328 P.2d 785 (1st Dist., Div. 1, 1958), which in turn relied in principal part for its holding on *Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp., supra,* and cases following the reasoning of that court. As noted above, *Seckinger, supra,* clearly holds that indemnity agreements running in favor of the United States must be construed under the federal common law, and further, that court expressly declined to consider other basis for liability where the parties had contracted with each other on the subject. It would appear inappropriate for this Court to do so. For this reason, the Court declines to hold Wood liable on a breach of contract theory.

### CONCLUSIONS OF LAW

1. That the employees of the United States Government were negligent in not reporting to their superiors the incidents noted Findings 10, 11 and 12. This negligence was independent of the negligence of any other party, but was concurrent therewith. Considering all of the aforesaid negligence, it contributed to the death of the decedent, and such negligence amounted to ten percent (10%) of the total negligence of one hundred percent (100%) in the premises.

2. The employees of the third-party defendant Wood were negligent in the premises. Their negligence was independent of but concurrent with the negligence of the

---

**6.** There is some indication that the principles of that case were relied upon in *Crocker Citizens Natl. Bank v. United States,* 320 F.Supp. 673 (N.D.Cal.1970). As noted by Judge MacBride, the doctrine of *Ryan Stevedoring, supra,* has been limited to admiralty type cases by the Fifth Circuit.

The Court can find no authority for the Government's position that *Crocker Citizens Natl. Bank, supra,* is the law of the circuit. Of course, as the Court has found that the express indemnity provisions of the Government's contract with Wood entitles it to indemnity for the portion of negligence caused by Wood, it is not necessary to find other grounds for liability.

employees of the United States. Of the total amount of the negligence in the premises, *i.e.*, one hundred percent (100%), their negligence was ninety percent (90%).

3. The plaintiffs are entitled to a judgment against the United States on the issue of liability.

Counsel for the plaintiffs is directed to lodge with the Court and serve copies of a proposed Judgment in conformity with these Findings of Fact and Conclusions of Law within twenty (20) days from the date of this Order.