BAKER, Chief Judge,
with whom ERDMANN, Judge, joins (dissenting):
SUMMARY
The military judge concluded that “[a]ll of the evidence indicates that the accused had at and since the time he took the oath of enlistment the de facto capacity to contract and the actual capacity to understand the significance of enlisting in the armed forces.” The military judge further concluded that “[a]ll of the evidence indicates that the accused’s enlistment was voluntary” for the purpose of establishing personal jurisdiction. The military judge committed two errors in reaching these conclusions.
First, “all of the evidence” does not indicate that Appellant had the capacity to enlist or do so voluntarily. Indeed, the evidence provided by Appellant’s psychologist indicates the opposite. Among other things, she stated in a declaration that:
As a result of his conditions, he is preoccupied with meeting his immediate needs at the risk of his long-term benefits. His brain does not utilize critical thought and reasoning, as demonstrated by his impulsive behavior. Due to his autism and ADHD, [Appellant] fails to weigh the consequences of his actions ....
I have been asked whether in my professional opinion, and based upon my over ten years of clinical evaluation of [Appellant], do I believe that [Appellant] had the mental capacity to understand the significance of his enlistment in the military. My answer is no.
Nevertheless, this and other evidence running counter to the Government’s position was not addressed in the military judge’s analysis of Appellant’s motion to dismiss. Thus, we cannot know if he reached the right decision regarding jurisdiction, because he did not reach it the right way — by analyzing and weighing all the evidence before the court, including and in particular, the testimony and declaration of Appellant’s long-term treating psychologist.
Neither did the military judge define the critical concept at issue in this case: What it means to “voluntarily enlist.” Ordinarily, a military judge is presumed to know the law and apply it correctly. United States v. Rodriguez, 60 M.J. 87, 90 (C.A.A.F.2004). However, in the absence of a statutory definition, case law, or a definition agreed to by the parties at trial, we cannot determine if the military judge applied the correct standard, or even what standard he used in applying *473 Article 2(c)(1), Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 802(c)(1) (2006).
To the extent the military judge equated the capacity to enlist with the simple presence or absence of insanity, he erred. As in the plea context, the capacity to do something voluntarily requires contextual analysis, not a simple determination that someone is legally sane. As recognized by the United States Supreme Court and this Court, this is especially important where the spectrum of developmental disorders is at issue.
As a result, the military judge abused his discretion in ruling on the defense motion to dismiss and I respectfully dissent.
BACKGROUND
Appellant was diagnosed with autism in 1996. He was subsequently diagnosed with obsessive compulsive symptoms, attention deficit hyperactivity disorder (ADHD), and oppositional defiant disorder (ODD). In 2006, he was sent to the Devereux Cleo Wallace Center in Denver, Colorado, after being expelled from his high school and in exchange for dismissal of related criminal charges for burglary, receiving stolen property, and carrying a dirk or dagger. The facility is a lockdown facility designed to treat children and adolescents who have “significant mental health and behavioral needs.”
In January 2008, Appellant enlisted in the United States Marine Corps. At the time of his enlistment the United States Marine Corps knew or should have known that Appellant was not a suitable candidate for service. All parties to this case and the military judge, and the Court of Criminal Appeals agree on this fact.
Dr. Julie Sehuck is a psychologist who treated Appellant as a patient for autism, ADHD, ODD, and a conduct disorder over a ten-year period between 1997 and 2006.[1] Dr. Schuek declared that Appellant’s autism manifests itself in a fixation on military fantasy and impulsive behavior, including an inability “to weigh the consequences of his actions.” Specifically, she stated the following in a declaration to the court:
[Appellant] maintains significant limitations in his ability to make non-superficial social connections. Also, as a result of his conditions, he is extremely impulsive, lacking judgment and reasoning skills necessary to make daily life decisions. Developmentally, he is mentally like a child at the age of 14. As a result of his conditions, he is preoccupied with meeting his immediate needs at the risk of his long-term benefits. His brain does not utilize critical thought and reasoning, as demonstrated by his impulsive behavior. Due to his autism and ADHD, [Appellant] fails to weight the consequences of his actions. His pursuit of gratifying his immediate needs fueled by his impulsivity have resulted in a long history of poor choices that evidence his lack of judgment and reasoning skills necessary to make life decisions.
... What makes [Appellant’s] situation even more complicated is that his perceptual accuracy and reality testing are impaired, meaning he believes he can take on more challenging tasks than he is capable of.
... Given the limitations that I have described, [Appellant] is unable to independently handle his daily personal affairs, make important decisions, or manage his own money without significant structure and supervision. His plans and priorities focus on his immediate and often unrealistic desires, not on what is in his best interest in the long run.
She also testified before the court reiterating what was in her declaration, including that Appellant suffered from autism, ODD, a conduct disorder, and ADHD, which is characterized by symptoms including “impulsivity *474 and hyperactivity making it hard for him to make ... thought out decisions.”[2] She explained that a key obstacle for an individual with autism is impulse control, and that a large focus of treatment for autism is improving impulse control.[3]
At the time of Appellant’s enlistment, the Marine Corps recruiter knew or should have known that Appellant’s grandmother had a limited conservatorship over Appellant and that Appellant had been treated for fifteen months in a mental health facility in Colorado for behavioral problems. All parties to this case and the military judge agree on this fact. The exercise of due diligence would also have revealed that while at the Colorado facility, Appellant received “psychiatric care and counseling to deal with [his] desire to view child pornography.”
In 2009, Appellant was tried by general court-martial for several offenses including fraudulent enlistment for deliberately concealing that he had received psychiatric care and counseling to deal with his desire to view child pornography.
The question before this Court is whether Appellant was subject to the personal jurisdiction of a military court-martial. As the majority correctly concludes, this is a question of federal law, not state law.[4] Under the Supremacy Clause, laws enacted by the United States pursuant to the Constitution are “the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.” U.S. Const, art. VI. Indeed, the Supremacy Clause was designed:
to avoid the introduction of disparities, confusions and conflicts which would follow if the Government’s general authority were subject to local controls. The validity and construction of contracts through which the United States is exercising its constitutional functions, their consequences on the rights and obligations of the parties, the titles or liens which they create or permit, all present questions of federal law not controlled by the law of any state.
United States v. Allegheny County, 322 U.S. 174, 183, 64 S.Ct. 908, 88 L.Ed. 1209 (1944) (overruled on other grounds). Just as “it would make little sense to have the Government’s liability to members of the Armed Services dependent on the fortuity of where the soldier happened to be stationed at the time of the injury,” Stencel Aero Eng’g Corp. v. United States, 431 U.S. 666, 671, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977), so too it would make little sense for the interpretation of an enlistment contract to depend on the fortuity of where the soldier happened to be when the enlistment contract was signed.
“When an accused contests personal jurisdiction on appeal, we review that question of law de novo, accepting the military judge’s findings of historical facts unless they are clearly erroneous or unsupported in the record.” United States v. Melanson, 53 M.J. 1, 2 (C.A.A.F.2000).
ANALYSIS
Article 2, UCMJ, governs the validity of enlistment for the purpose of determining who is subject to the UCMJ. Subsection (b) of the article states that “[t]he voluntary enlistment of any person who has the eapaci *475 ty to understand the significance of enlisting in the armed forces shall be valid for purposes of jurisdiction.” Article 2(b), UCMJ, 10 U.S.C. § 802(b). Thus, by implication the text and case law indicates, if a person does not have the capacity to understand the significance of enlisting then a court-martial shall not have jurisdiction.
However, subsection (c) establishes jurisdiction “[njotwithstanding any other provision of law” when four conditions are met:
a person serving with an armed force who—
(1) submitted voluntarily to military authority;
(2) met the mental competency and minimum age qualifications of sections 504 and 505 of this title at the time of voluntary submission to military authority;
(3) received military pay or allowances; and
(4) performed military duties.
Article 2(c), UCMJ, 10 U.S.C. § 802(c). Appellant satisfied the second, third, and fourth of these conditions. The question before the military judge was whether Appellant had the capacity to voluntarily enlist. Because Article 2(c), UCMJ, applies “[njotwithstand-ing any other provision of law,” in theory, one could lack the capacity to understand the significance of enlisting for the purposes of subsection (b), but nonetheless voluntarily submit to military authority for the purpose of subsection (e)(1). But that would depend on the meaning of “voluntarily” in subsection (e)(1) and the extent to which it is coterminous with a “capacity to understand the significance of enlisting in the armed forces.”
This critical term is not defined in this section of the UCMJ. Nor is the meaning of voluntarily for the purpose of Article 2(c)(1), UCMJ, addressed or defined in case law. At oral argument and in their briefs, the parties defined the term with reference to dictionary definitions and plain English descriptions. They did not agree on its meaning. The military judge did not state or provide a definition in his ruling. The majority fills this void by equating a lack of voluntariness with either duress and/or coercion or “the concept [of insanity] codified in § 504 [which] is akin to [the] capacity to contract.”[5] United States v. Fry, 70 M.J. 465, 470-71 (C.A.A.F. 2012). In other words, unless a person is coerced, drunk, or insane he or she has the capacity to understand the significance of enlisting and voluntarily submitting to military authority.
As both sides of the debate recognize, mental capacity and not coercion is the issue at stake in this case. However, there is disagreement on whether the concepts embedded in 10 U.S.C. § 504 are “akin to” and determinative of the “capacity to contract.” In my view, the definition fails for four reasons. First, Congress placed the reference to the 10 U.S.C. § 504 insanity standard in a separate subsection of Article 2(c), UCMJ, thus the act of doing something voluntarily for the purpose of subsection (1) must mean something more than that one meets the “mental competence” requirement for the purpose of subsection (2). In other words, interpreting “voluntarily” in subsection (1) to mean the same thing as “mental competence” in subsection (2), as the majority does, violates “a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or significant.” TRW Inc. v. Andrews, 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001).
Second, hinging the capacity to “submit voluntarily to military authority” on the insanity prohibition of section 504 turns the nuance of mental health and the spectrum of developmental disabilities into a yes or no question, rather than the spectrum of conditions that actually exists. See Dep’t of Defense Instr. 6130.03 Medical Standards for Appointment, Enlistment, or Induction in the Military Services end. 4 para. 29 (Apr. 28, *476 2010 (incorporating Change 1, Sept. 13, 2011)) [hereinafter DoD I 6130.03].[6] Thus, while the § 504 standard may offer clarity and simplicity for lawyers, it does not reflect the range of mental health conditions and disabilities that may actually affect the capacity of recruits to voluntarily enlist.
Third, such a standard is inconsistent with the approach of the Supreme Court and this Court in assessing whether pleas are voluntary. Voluntary is a term familiar to the plea process if not to Article 2, UCMJ, jurisprudence. Waiver of a guilty plea must be not only “voluntary” but also “knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences.” Brady v. United States, 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970). The voluntariness of a plea “can be determined only by considering all of the relevant circumstances surrounding it.” Id. at 749, 90 S.Ct. 1463. To ensure that a plea is voluntary and to prevent improper terms being imposed:
the military judge must assure on the record that the accused understands the meaning and effect of each provision in the pretrial agreement; as well as make sure that the written agreement encompasses all the understandings of the parties and that they agree with his interpretation of the plea bargain.
United States v. Bartley, 47 M.J. 182, 186 (C.A.A.F.1997) (quoting United States v. Jones, 23 M.J. 305, 308 (C.M.A.1987)) (emphasis added). Certainly, this Court has not upheld or rejected pleas solely on the basis of whether a person has been deemed sane.
Though it is true that one who is insane cannot act voluntarily, that does not prove the corollary that someone who is sane always acts voluntarily. Rather, where bipolar conditions are in play, for example, the Court has looked to how a particular condition affects the accused to determine whether pleas are knowing and voluntary. In United States v. Harris, for example, we held that an accused’s plea was improvident where some of the conflicting post-trial evidence demonstrated that he had been unable to appreciate the wrongfulness of his conduct. 61 M.J. 391, 393, 398-99 (C.A.A.F.2005). In United States v. Shaw, however, we concluded that the “mere possibility” of a conflict with a guilty plea was raised where an accused had merely claimed he suffered from bipolar disorder but presented no additional evidence that he in fact suffered from the condition or that it raised a substantial question regarding his mental responsibility. 64 M.J. 460, 464 (C.A.A.F.2007).
Courts are especially careful in evaluating pleas in the case of developmentally disabled persons to ensure that they are voluntary. See, e.g., Gaddy v. Linahan, 780 F.2d 935, 945 (11th Cir.1986) (holding that the trial judge had not adequately explained the nature of the crime and its elements to satisfy due process where the defendant was “illiterate and possesses minimal mental capacity” and “[h]is own attorney characterized him as ‘mentally retarded to some degree’ ”); United States v. Duhon, 104 F.Supp.2d 663, 671 (W.D.La.2000) (noting the need for sensitivity to the differences between mentally ill and “mentally retarded” defendants in assessing competency).
Finally, equating capacity and voluntary action to insanity runs counter to our common understanding of not only developmental disabilities but the plain meaning of what it means to act in a voluntary manner.[7] A voluntary act has been defined as an act that *477 is “[d]one by design or intention.” Black’s Law Dictionary 1710 (9th ed. 2009). A person cannot knowingly and voluntarily do something if that person does not have the capacity to understand what he or she is doing.
In this case, the military judge did not define the term “voluntarily” and therefore we do not know against what measure of “voluntary” Appellant’s condition was adjudicated. In the absence of an agreed-upon or understood definition, and in the context here, this was an abuse of discretion. In any event, determination as to whether an action has been taken in a voluntary manner requires individual adjudication of a particular person’s condition and circumstance, not per se reference to § 504.
Thus, the military judge also abused his discretion in analyzing the facts. First, the military judge plainly erred when he concluded that “[a]ll of the evidence indicates that the accused’s enlistment was voluntary.” He also concluded that there was “no evidence” that Appellant’s enlistment was involuntary. The majority concedes that one of these statements is inaccurate, but dismisses the military judge’s repeated conclusions as no more than “overstat[ing] matters” and negated because “the military judge considered contrary evidence.” But if the military judge considered contrary evidence it is not reflected in the record or in the use of the unambiguous term “all.”
Most importantly, there is no indication in the military judge’s ruling that he considered and analyzed the medical testimony and declaration from Dr. Schuck. This was an abuse of discretion in a case that hinged on whether a developmentally disabled recruit had the capacity to voluntarily enlist and/or submit to military authority. In particular, the military judge abused his discretion by failing to address statements by Appellant’s treating psychologist such as:
Developmentally, [Appellant] is mentally like a child at the age of 14 .... Due to his autism and ADHD, Josh fails to weigh the consequences of his actions. His pursuit of gratifying his immediate needs fueled by his impulsivity have resulted in a long history of poor choices that evidence his lack of judgment and reasoning skills necessary to make life decisions.
... I have been asked whether in my professional opinion, and based upon my over ten years of clinical evaluation of Josh, do I believe that Josh had the mental capacity to understand the significance of his enlistment in the military. My answer is no.[8]
In my view, it was not possible for the military judge to reach an informed conclusion about Appellant’s capacity to enlist as well as to voluntarily submit to military authority without first acknowledging, analyzing, and addressing these critical statements. Thus, we cannot know if the military judge reached the right decision regarding jurisdiction, because he did not reach it the right way — by stating the standard he was applying and then analyzing and weighing all the evidence before the court, including and in particular, the testimony and declaration of Appellant’s long-term treating psychologist in light of that standard. As a result, I would reverse the decision of the lower court and respectfully dissent.
*478 Appendix A
1 want to note for the record I was confused by your argument. Clearly what you were telling me, Mr. Studenka, was that you didn't want me to consider the assumed underlying behavior that would require the counseling as uncharged misconduct.
CC: That's correct, sir.
MJ: t certainly will not consider that in determining a sentence in this case.
CC: Yes, sir. Thank you.
MJ: We've got Dr. Schuck on the phone?
CC: We do, sir.
MJ: Okay. Why don't we unmute her.
[The defense counsel complied.]
CC: Dr. Schuck, are you there?
WIT: Yes, I am.
CC: I'm going to turn you over to -- the judge or the prosecutor may swear you in here in a moment and then you're going to testifying, okay.
And just to complete this, sir, I didn’t have a chance to give her the whole scoop, but obviously in the room now are the military judge. Colonel Ewers, a court reporter, all the defense team as you're aware, Major Marshall as the prosecutor, Mary Beth Fry and several spectators, none that Z particularly recognize.
Dr. Julie 2. Schuck, a civilian, was called as a witness by the defense, was sworn, and telephonically testified as follows:
DIRECT EXAMINATION
Questions by the prosecution:
Q. Dr. Schuck,-could you -please-state your full name spelling your last.
A. Mv full name is Julie Elliott Schuck, last name S-C-H-U-C-K.
*479 0 r* P> B 0 ¡0 CT pj rr V) & M n> q P (L> to H-0. rr 5,
CO H* tí rt rr 0 X C P a H* P IQ ft o p w <T> O o P> H» W' 0 H 9 H* 3
TC: Thank you.
CC: Thank you, sir.
Questions by the defense counsel:
I've been licensed since 1197.
Dr. Schuck, could you please -- what1s your current O
I am a licensed psychologist in private practice in the State of California. >
And how long have you been a licensed psychologist.
Q. Ma’am, I just want to give the military judge a.little bit of your background. What training and experience and education have you received in the area of psychology?
A. Well, I received my Ph.D. from the California School of Professional Psychology in San Diego in 1993. I began working in the field actually in 1987 and I began working at the University of California Irvine Child Development Center which is a special day treatment program for children with severe behavioral disorders. In my capacity there, I did work at the Child Development Center for.11 years and my roles ranged from social skills coordinator to the school intervention coordinator. I was a therapist consultant on a nation wide treatment study program for children with attention deficient hyperactive disorder, as well as the staff psychologist overseeing and supervising the staff in conducting all the parent training for the program.
Additionally, I worked as a psych assistant where I saw -- I conducted groups and individual and family sessions under the supervisor of a licensed psychologist and then in 1997 when I received my license I was officially in private practice and have been so ever since.
My private practice I specialize in group social skills training for kids with attention deficient hyperactivity disorders, as well as kids on the autistic spectrum. I do a lot of school based interventions working with teachers and professionals working with these children *480 and a tremendous amount of parent training and family work to help everybody get along as best they can.
Okay. Are you currently in good standing with the California State Board of Psychology?
Yes, I am. >
Are there any -- since you obtained your license, are there any continuing education requirements for you as a psychologist? lO
Yes. Every two years I'm required to take 36 hours of professional training in approved courses through the State of California.
And have you ever been subject to any disciplinary action through the California State Board of Psychology?
No, I have not. >
Now, you said a few things that you do currently in your private practice. 1 just want to give the judge a sense of the extent of your private practice. What -- first of all, how many patientB a week do you currently see?
average, see 20 and 30 patients a week.
And how many patients in total have you seen as a psychologist ?
You know. I'd have to estimate, I would say over 1500. >
Now, you mentioned a few things that you -- I guess your practice specializes in. Is that -- you said group social skills? O
That’s correct.
What is it?
The majority of my practice children are referred for group social skills training and that is an opportunity for kids with -- similar ages to come together in a very structured and positive environment where I use behavior modification to work on their behaviors or on a point system and a level system and all the while they're learning a variety coping strategies and ways to get along with peers and adults, things that not easily come as easy for kids with autism or with behavioral disorders.
Now, you previously mentioned that you often deal with kids on the autistic spectrum, correct?
That's correct. <
*481 What does that mean, the autistic spectrum?
Well, it's, you know, there is quite a big spectrum. Some you can even look at -- same use the description of sort of a rainbow. On one end you have the very low functioning autistic child who has no language, who has no way to interact, who is also very low on intelligence which, you know, we considered mentally retarded. Then you have the very high end where you have some very gifted, intelligent people who are quite intelligent. However, their social interactions are -- still remain gravely impaired or qualitatively impaired and their communication skills are qualitatively impaired, and sort of the hallmark is they still may engage in either restricted or repetitive patterns of behavior or interests.
Well, what is autism?
Well, for a child to be diagnosed with autism, there has to be evidence that there is a qualitative impairment in their social interaction, they have great difficulty carrying on a conversation, giving eye contact, using facial expression, they can’t maintain sort of age appropriate relationship. They have to have a qualitative impairment in communication. There has to be a significant delay in the acquisition of language and, again, they have to have this -- evidence of this stereotypic or repetitive behavior or a restrictive range of interest.
Now, you said qualitative impairment. What do you mean by that? o
That means compared to a typical person, and in the field we call them, you know, neuro-typicals, they are, you know, vastly and obviously different. On the high end and with high function autism, they can blend in much more and particularly with a number of interventions we have for children on the spectrum. They can begin to blend in more and more socially where sometimes people wouldn't know unless you're trained. >
Can autism be cured?
Autism cannot be cured.
Gan-somebody with autism be treated to improve?
Yes.
*482 And cart you explain that to the military judge?
--ray individuals maintain their authenticity but be able to blend in in our social world. So learn -- they have to work extra hard to learn the social skills that we sort of naturally picked up as neuro-typical. So they need a lot more practice and they need a lot more instruction and breaking being it down because from an early age that wasn’t their interest. They were not interested as infants in faces. They're interested in objects.
Okay. Well, Dr. Schuck, do you know Josh Fry?
Yes, I do.
Okay. And how is it that you know Josh?
working with Josh June of 2000. He was referred to me specifically for social skills training by Dr. Christine Iverson who is one of the many professionals that has worked with Josh over the years upon him coming to live with Mary Beth. She recommended social skills training and Mary Beth followed up and he entered into my program shortly after the initial evaluation in June.
Now, just to be clear, are you saying that he was referred to you based the diagnosis of Dr. Iverson? c>
Well, actually he was diagnosed even earlier on by Dr. Pauline Filipec who is, you know, a national expert in the field of autism, and he'd been seen and evaluated and in many, many treatment programs prior to him coming to my office. >
And I may have stepped over this, but what was the diagnosis that he had received prior to coming to you? a
Oh, he was diagnosed with autism.
Okay. You said he came to you in 2000. How long -- or what was the extent of your treatment of Josh? o
Well, I saw Josh primarily for group social skills training. However, I was also very involved in the educational component. I attended the majority of Josh's school meetings, which are called IEPs. I also worked with him individually and with Mary Beth to work on home programs to help them get along and generalize his skills he's learning from group into the real world, which is a difficult task. <
*483 Okay. In total, through all ot that, that help and assistance and treatment, how many years did you actually have Josh as a patient? ©
Oh, gosh. Well, I've been apprised of the -- I haven't seen Josh in some time, so I really -- it's been since probably 2006. But I have been consulting with Mary Beth throughout, kind of overseeing the case throughout his treatment.
Okay. Well, I guess what I'm trying to get -- so the military judge understands, you treated Josh from 2000 to when? About 2006? O
Yes.
Okay. And during that period you were doing the group skills training and parent skills and also the school intervention that you described? ©
Yes, and it all varied because, you know, the history, depending upon what his needs were and he was receiving services from County Mental Health as well. So it was really --we just made the decisions based on his -- the current needs that he had.
Okay. Now, as part of your treatment of him for the things you've already .described, would you also assess him yourself, and that is, you know, make a diagnosis yourself? O
Well, I'm always assessing and diagnosing, you know, with any of my patients, just really not anything that might come up.
Okay. And what diagnosis have you made of Josh during your treatment? ©
Well, with my, you know, extensive experience with Josh, he also meets criteria for attention deficit hyperactivity disorder which is characterized by a number of symptoms of inattention, inability to concentrate, as well as symptoms of impulsivity and hyperactivity making it hard for him to make decisions, thought out decisions. He also meets criteria for oppositional defiant disorder which is an individual who tends to argue when denied own way, argue with adults, blames others and has difficulty taking responsibility for actions. And, you know, prior to him going away to a residential facility he met criteria for conduct disorder because of the multiple stealing and lying and staying out in the evening. So those would be a diagnosis that he would meet criteria for. >
*484 Did you also diagnose him with autism yourself?
Yes. I mean, he -- Hite I said, although he has changed from I would say low functioning in the beginning to more high functioning, yes.
Well, let's talk about in the beginning. When Josh came to you initially what led you to diagnose him as autistic?
Josh had significantly impaired social relations. He had great difficulty maintaining conversations with kids his own age, giving eye contact. There's a high frequency of 3illy and odd and age inappropriate behaviors that would set him apart. In terms of greetings and showing interest in others, it was significantly delayed. He also had behavioral accesses such as verbal aggression and, again, sort of the silly and odd inappropriate behavior. He -- and so those, were his -- the history and the goals revolved around the social interactions and the communication, and also keeping in check his repetitive or -- his interest in -- his specific interest in specific topics. So he's sort of preoccupied with special interests and Josh's special interest tended tc revolve around police work, fire services, and the military.
Okay. Now, during the course of your treatment did you see any signs that Josh's symptoms improved? o
There were a great deal of improvement. Josh responds to my program right from the get-go. The major improvements occurred with his social relations, being able- to listen to somebody, give eye contact, have facial expressions, show interest, greetings. I mean, he really, really improved very quickly in this area. A he also greatly improved in reducing his silly and odd and age inappropriate behavior. >
And any of those improvements changed your diagnoses that you previously indicated you've made? o
No. >
Now, we're going-to hear some testimony in a moment about a plan for Josh in terms of further treatment and X know I've consulted with you, as has Mary Beth. Fry. As . one who has- treated Josh in. the. -pas t,- do you have thoughts or opinions as to Josh's ability to respond to future treatment as it relates to say child pornography? IO
X think he has a good chance of responding well to a treatment program as he has in the past. A restricted. > *485 very well supervised and intensive program he has respond very well. When he was younger just being able .to be in _g positive, environment where he was recognized for all the good choices he was making really benefited him. But definitely it’s critical that he be in a very structured, intense treatment environment.
CC: Okay. Well, X thank you for your time, Doctor. Major Marshall or the judge may have some questions for you.
TC: No questions from the government, sir.
MJs Dr. Schuck, just wait, X just need to make sure X don’t liave any questions. This is Colonel Ewers. Can you just sit tight for a second, please.
wiTi Absolutely.
EXAMINATION BY THE COURT
Questions by the military judges
Q. It occurs to me, Dr. Shuck, that the very thing that you say constitutes a diagnosis of autism is the chief obstacle to successful treatment. Is that a fair statement?
A. In terms of like the ability to empathize, that piece?
Q. Yeah, that and the -- it’s inpulse control and it’s what you need to teach, as you do with all children presumably, is impulse control. Is that the focus of your treatment?
A. That's a large focus of the treatment- that -- that I provide is learning that which it can be learned but it's a lot more difficult.
You said that there’s no cure for autism but as with maybe ADHjjfc is autism something that tends to get better with age?
It can and I’ve actually also seen it get worse. It depends on what the individual is receiving in terms of services and each case is uniquely different. And that's the same for ADHf) or any of the mental health disorders, you know.. They cari, move and...progres.s in a way so that they no longer are causing as much impairment .in their life, but they can easily regress as well.
*486 WHO. you just tell me again what appeared to de tne Key to the successes that you saw in Private Pry's treatment? o
The key -- one of the keys was the positive interactions he was receiving. So a lot of times these individuals spend their life getting corrected because there's so much to correct. So the emphasis on what is going right, what strengths you have to build on, were key. . Throughout my history of working with Josh, he’s been -- he’s almost always been very respectful and compliant and I think it's largely to do with the amount of positive interaction X have had with him. But the other component is the structure and the supervision. He was most successful throughout the time that I treated him when he had chose three components, the positive interaction, the structure, and the supervision so that he could develop that pattern of making good choices over and over again and get the nature reinforcement of what comes from those good choices.
So would you say that the -- what you called repetitive behavior or range of interests, is that something that internally evens out or is it simply you fix those by ensuring that they're responding the proper stimuli?
Well, it's almost like a balance like for'-- pretty much for any of us, you know. If he's so preoccupied that he can't do other things like maintain a job, maintain relationships, then it causes impairment. But -- so the goal of having a sort of special interest or a special hobby for these individuals, as well as for of us, is be able to balance it out so it's not causing problems in other areas of your life.
I guess my question though is does the intensity of the interest change or — o
Yes. Yes. It's usually, you know, it's not like one interest always for, you know, an entire lifetime. A lot of times it does stay the same but a lot of times it shifts for individuals. It varies. P
Questions in light of mine, Mr. studenka? 3 Q
No, six*. u o
Major Marshall? 3 Q
No, sir. H a
*487 MJ: Dr. Schuck, we appreciate your testimony here today. I'm going to excuse you, which means that Major Marshall .is going to.disconnect you from the line. Again, thank you.
WIT: Okay. Thank you.
(The telephonic connection was terminated.]
MJ: Defense.
CC: Yes, Sir.
At this time, the defense calls Mary Beth Fry to the stand.
Ms. Mary Beth Fry, a civilian, was called as a witness by the defense, was sworn, and testified as follows:
DIRECT EXAMINATION
Questions by the prosecution:
Q. Could you please state your full name spelling your last.
A. Mary Beth Fry, f-r-y.
Q. And of what city and state are you a resident?
A. Newport Beach, California,
CC: Sir, permission to enter the well.
MJ: Granted.
Questions by the defense counsel:
Q. Now, ma'am, I know you testified in the past at an Article 32 as well as the motion regarding jurisdiction. Obviously this focus is a little different. I want to ask you first, you are Josh’s grandmother, correct?
A. That's correct. I am his fraternal grandmother.
Q. Did you, in fact, adopt Josh?
A. Yea, I did
Q. And how old was Josh when you adopted him?
A. He was 13 when I adopted him.
*488 [[Image here]]
*489 [[Image here]]
*490 [[Image here]]

. There is some inconsistency in the record as to when Appellant was initially diagnosed and the length of Dr. Schuck's treatment. Ms. Fry’s declaration indicates that Fry was diagnosed in 1995 at the age of seven. The record indicates that Dr. Schuck treated Fry between 2000 and 2006, which would be a six-year period rather than a ten-year period. However, Dr. Schuck's declaration provides that the treatment period was January 1997 through November 2007, with a break in treatment between July 2006 and October 2007, which would mean a total treatment period of just under ten years.

.The Government's psychologist, Captain Bruce T. Reed, also testified at trial and, after stating "I’m going to hedge a bit,” indicated his belief that there was at least a fifty-one percent chance that Appellant understood the significance of enlisting. However, Dr. Reed had not treated Appellant for any period of time, was not familiar with Appellant’s full history or medical records, and did not know Appellant was subject to a conservatorship. More importantly for the purpose of this dissent’s analysis, the military judge did not address or weigh Dr. Reed’s testimony against the testimony and declaration of Dr. Schuck.

. The Government argued on appeal that Dr. Schuck's testimony contradicted her declaration and retreated from its position. That is not how I read the testimony, which is reproduced as Appendix A to this opinion. The declaration is reproduced in Appendix B.

. As a result, I need not and do not reach a conclusion as to whether or how the Full Faith and Credit Clause applies only with respect to the state court proceeding. Whatever effect is given to the state court proceeding, if any, the question before this Court is whether the military judge erred in applying Article 2, UCMJ.

. Section 504 states:
Insanity, desertion, felons, etc. — No person who is insane, intoxicated, or a deserter from an armed force, or who has been convicted of a felony, may be enlisted in any armed force. However, the Secretary concerned may authorize exceptions, in meritorious cases, for the enlistment of deserters and persons convicted of felonies.
10 U.S.C. § 504(a) (2006).

. The regulation refers to autism as "autistic spectrum disorders." For our purposes, it does not matter where Appellant fell on the autism spectrum since the military judge's error was not based on where Appellant fell on the spectrum, but in failing to define the term "voluntary” and in failing to address and analyze all the evidence before the court regarding Appellant’s capacity to voluntarily submit to military authority.

. Department of Defense regulations now prohibit individuals with autism from joining the armed forces: "Unless otherwise stipulated, the conditions listed in this enclosure are those that do NOT meet the standard by virtue of current diagnosis, or for which the candidate has a verified past medical history.” DoD I 6130.03 end. 4 para. 2. One such condition is "[p]ervasive developmental disorders ... including Asperger Syndrome, autistic spectrum disorders, and pervasive developmental disorder — not otherwise specified.” Id. at para. 29.C.

. Neither did the military judge reference or address the investigating officer's (IO) conclusion that:
[i]t is highly questionable whether the Accused had the mental capacity at the time of enlistment to form the specific intent necessary to "deliberately conceal” his mental disorder. Further, there is compelling evidence in mitigation of undue influence, overreaching, and recruiter misconduct, all of which may negate the specific intent required for [a charge of fraudulent enlistment].
While not error in its own right to omit such reference, the IO’s report clearly undercuts the conclusion that all the evidence reflected a capacity to voluntarily enlist.